2005-NMCA-012

105 P.3d 302

**STATE of New Mexico, Plaintiff–Appellee,**

v.

**Jake SCHOONMAKER, Defendant– Appellant.**

No. 23,927.

Court of Appeals of New Mexico.

Sept. 10, 2004.

Certiorari Granted, No. 28,954, Jan. 21, 2005.

752

Patricia A. Madrid, Attorney General, James O. Bell, Assistant Attorney General, Santa Fe, NM, for Appellee.

John B. Bigelow, Chief Public Defender, Steven J. Potter, Assistant Appellate Defender, Santa Fe, NM, for Appellant.

## OPINION

BUSTAMANTE, Judge.

{1} Defendant appeals his conviction for Child Abuse, NMSA 1978, § 30–6–1(D)(1), (2) (2001), and sentencing as a serious violent offense pursuant to NMSA 1978, § 33–2–34(L)(4)(n) (2004). The issues raised are whether: (1) the jury was properly instructed on negligent child abuse, (2) an acquittal on intentional child abuse and subsequent prosecution for negligent abuse violates double jeopardy, (3) character evidence was improperly excluded, (4) there is sufficient evidence for the conviction, and (5) the district court's findings support its determination that Defendant's conviction is a serious violent offense. We affirm.

## FACTS AND PROCEEDINGS

{2} Defendant was indicted on August 9, 2000, for intentional child abuse resulting in great bodily harm, or in the alternative, negligent child abuse resulting in great bodily harm. At the first trial, the jury acquitted Defendant of charges relating to intentional child abuse, but hung on whether he committed negligent abuse. An order declaring a mistrial was entered on March 20, 2002. On September 17, 2002, Defendant was retried on one count of negligent child abuse. Defendant was convicted after a five-day jury trial. The testimony elicited at trial supports the following facts.

{3} On June 20, 2001, "DT" was delivered five weeks premature. According to the baby's treating physician, Dr. Vigil, DT was released from the hospital on June 27 and examined by him on July 5, 19, and 21, 2000. Other than a mild case of bronchitis, Dr. Vigil observed DT to be a normal and healthy newborn.

{4} During this period, DT's mother (Mother) dated Defendant, and testified that she usually stayed at his home a couple of nights a week. Mother testified that she and DT stayed with Defendant on July 23 and 24. At 3:20 p.m. on July 24, 2000, Mother left DT alone with Defendant at his home for the first time. She had arranged for Defendant to take care of DT so that she could go to work. Defendant agreed to take care of DT for about an hour and a half until the baby's grandmother got off work and could pick him up. According to Mother, she changed and fed DT before leaving, then laid him on the sofa with his back against the sofa. She testified that DT was normal and healthy, up to and including July 23 through July 24 at 3:20 p.m.

{5} Two hours later, at 5:30 p.m., Defendant and the baby appeared at DT's great-grandmother's house. Defendant told DT's great-grandmother that DT had rolled off the sofa and that there was a problem. She saw that DT had vomited and while cleaning him, noticed he was very pale, limp, and "just staring." After making a brief call to her daughter for advice, she took DT to a nearby urgent care clinic where he was examined and taken to UNM Hospital via ambulance.

{6} Medical tests revealed that DT had a severe subdural hematoma, retinal hemorrhages, and brain injury resulting in total blindness. The State's experts on shaken baby syndrome, Dr. Campbell and Dr. Wood, and two treating physicians testified that DT's injuries were diagnostic of major head trauma, resulting from a high-speed car crash or a fall from two or three stories, or abusive head trauma, known as "shaken baby syndrome" In their opinions, however, the

injuries were consistent with shaken baby syndrome resulting from violently shaking the baby. Dr. Campbell explained that DT had no external injuries indicative of an impact-type injury, and that his injuries were consistent with shaken baby syndrome and inconsistent with falling off a couch or shaking a baby to arouse it, even in a panic. She also opined that the injury was inflicted "very shortly [before DT became] symptomatic."

{7} Defendant, on the other hand, repeatedly told family members and police that DT had fallen from the couch. Over time, his story changed: he claimed that he had a car accident on the way over to the great-grandmother's house; he also said that he shook the car seat to keep DT awake. Although Defendant's mother denied it at trial, her prior testimony was that Defendant admitted shaking DT to revive the baby after he fell off the sofa. While he denied its implications, the State also produced a letter from Defendant to Mother admitting, "I shook [DT]."

{8} The district court sentenced Defendant to eighteen years imprisonment, and denied the State's request for aggravation but found the offense qualified as a serious violent offense, pursuant to Section 33–2–34(L)(4)(n). Defendant appeals his conviction from the second trial and the status of his conviction as a serious violent offense.

**Jury Instructions on Negligent Child Abuse**

{9} At the second trial, the jury was instructed on negligent child abuse:

### INSTRUCTION No. 3

For you to find Jake Schoonmaker guilty of Child Abuse resulting in Great Bodily Harm, as charged in Count 1, the State must prove to your satisfaction beyond a reasonable doubt each of the following elements of the crime:

1. Jake Schoonmaker caused [DT] to be tortured or cruelly punished [DT];

2. Jake Schoonmaker acted with reckless disregard and without justification. To find that Jake Schoonmaker acted with

reckless disregard, you must find that Jake Schoonmaker knew or should have known his conduct created a substantial and foreseeable risk, he disregarded that risk and he was wholly indifferent to the consequences of the conduct and to the welfare and safety of [DT];

3. Jake Schoonmaker's actions or failure to act resulted in great bodily harm to [DT];

4. [DT] was under the age of 18;

5. This happened in New Mexico on or about the 24th day of July, 2000.

### INSTRUCTION No. 4

For you to find Jake Schoonmaker guilty of Child Abuse resulting in Great Bodily Harm, as charged in the Alternative of Count 1, the State must prove to your satisfaction beyond a reasonable doubt each of the following elements of the crime:

1. Jake Schoonmaker caused [DT] to be placed in a situation which endangered the life or health of [DT];

2. Jake Schoonmaker acted with reckless disregard and without justification. To find that Jake Schoonmaker acted with reckless disregard, you must find that Jake Schoonmaker knew or should have known his conduct created a substantial and foreseeable risk, he disregarded that risk and he was wholly indifferent to the consequences of his conduct and to the welfare and safety of [DT];

3. Jake Schoonmaker's actions or failure to act resulted in great bodily harm to [DT];

4. [DT] was under the age of 18;

5. This happened in New Mexico on or about the 24th day of July, 2000.

{10} Defendant presents two basic arguments. As best we can tell, his first argument is that, by omitting the terms "negligently and without justification," in paragraph one, after "Schoonmaker" and before "caused," the jury was allowed to convict Defendant under an improper standard. This omission, together with the use of the language "knew or should have known," a term associated with a civil

negligence standard, and the omission of "willful or wanton," terms associated with reckless conduct, according to Defendant, confused and misdirected the jury by failing to apprise the jury that they were to consider Defendant's guilt or innocence under a criminal negligence standard. Defendant also seems to say that the omission leaves the instructions ambiguous because they mix objective criteria, that he knew or should have known of the risk, with a subjective state of mind, that he disregarded the risk and was wholly indifferent to the consequences of his conduct. In short, Defendant asks how can a person who is unaware of a risk, disregard it? Defendant suggests that the jury might have improperly convicted him on a lesser civil negligence standard for extreme carelessness or mere inadvertence.

{11} This leads to Defendant's second objection, which is that the jury should have been instructed that the State has the burden to prove Defendant had a subjective awareness of the risk of harm. Defendant argues that an objective standard allows the jury to presume that he had a subjective intent to disregard the risk and unconstitutionally shifted the burden to him to rebut the presumption.

{12} "The propriety of jury instructions given or denied is a mixed question of law and fact," which we review de novo. *State v. Magby*, 1998–NMSC–042, ¶ 8, 126 N.M. 361, 969 P.2d 965 (internal quotation marks and citation omitted) *overruled on other grounds by State v. Mascarenas*, 2000–NMSC–017, ¶ 27, 129 N.M. 230, 4 P.3d 1221. When reviewing for error, we determine "whether 'a reasonable juror would have been confused or misdirected' by the jury instruction." *State v. Cunningham*, 2000–NMSC–009, ¶ 14, 128 N.M. 711, 998 P.2d 176 (quoting *State v. Parish*, 118 N.M. 39, 42, 878 P.2d 988, 991 (1994)). To preserve an issue for appeal, a defendant must make a timely objection that apprises the trial court of the specific nature of the claimed error and invokes an intelligent ruling thereon. *State v. Varela*, 1999–NMSC–045, ¶ 25, 128 N.M. 454, 993 P.2d 1280.

{13} The record reveals that near the end of the second trial, the State requested, and the district court agreed, to delete the terms "negligently and without justification," from the tendered jury instructions to be consistent with the standard form of UJI 14–602 NMRA. Defense counsel objected to the omission and proposed an instruction, which instructed that if the jury found Defendant intentionally and purposefully shook the baby, they should contact the district court before deliberating further. He also requested an instruction defining criminal negligence, or alternatively, to reinsert the omitted terms. As the argument was presented below, counsel was primarily concerned with the issue of double jeopardy—that the jury understood they could only convict Defendant if he was guilty of criminally negligent child abuse rather than intentional child abuse—and with the issue of whether the jury was confused by an ambiguous instruction that did not identify "criminal negligence" as the standard or distinguish it from an intentional act. The district court rejected Defendant's proposed instructions.

{14} We find Defendant has narrowly preserved one issue: whether the omission of the terms, "negligently and without justification" was confusing or misleading such that the jury could have convicted Defendant under an improper standard. *State v. Sosa*, 1997–NMSC–032, ¶ 25, 123 N.M. 564, 943 P.2d 1017 (holding that the use of an ambiguous instruction that confuses or misleads a jury is reversible error). In negligent child abuse prosecution, the jury must be instructed that the state bears the burden to prove that the defendant was "criminal[ly] negligent," meaning that "defendant knew or should have known of the danger involved and acted with a reckless disregard for the safety or health of the child." *Santillanes v. State*, 115 N.M. 215, 222, 849 P.2d 358, 365 (1993). The jury must also be instructed on the definition of "reckless disregard." *Magby*, 1998–NMSC–042, ¶¶ 15, 20, 126 N.M. 361, 969 P.2d 965 (finding reversible error where negligent child abuse instruction did not define reckless disregard and jury might have understood negligence standard to criminalize careless or extremely careless conduct); *accord Mascarenas*, 2000–NMSC–017, ¶ 21,

129 N.M. 230, 4 P.3d 1221 (finding fundamental error where the jury could have convicted the defendant by erroneously using a civil negligence standard).

{15} In *Magby,* the jury was instructed on negligent child abuse in accordance with the standard articulated in *Santillanes:* "To find that [defendant] *negligently* caused child abuse to occur, you must find that [defendant] knew or should have known of the danger involved and acted with a *reckless disregard* for the safety or health of [Child]." *Magby,* 1998–NMSC–042, ¶ 5, 126 N.M. 361, 969 P.2d 965 (emphasis omitted). The Supreme Court reversed defendant's conviction, holding that the terms "negligent" and "reckless disregard" in the instruction created a fatal ambiguity, which raised a possibility that the jury convicted defendant under a civil negligence standard. *Id.* ¶¶ 13–15, 22. The Court found an instruction defining "reckless disregard" would have cured this ambiguity and directed "the UJI Criminal Committee to formulate a definition of 'reckless disregard' similar to the one tendered by defense counsel in this case for use in [future] negligent child abuse cases." *Id.* ¶ 17. UJI 14–602 was subsequently amended and the concept of criminal negligence was incorporated into the instruction by including the definition of reckless disregard as required by *Magby.*

{16} The district court instructed the jury under UJI 14–602 as it was drafted pursuant to these cases. The standard instruction omits the terms "negligently and without justification," and incorporates a criminal negligence standard that includes a definition of reckless disregard. Omitting the negligence language did not create the type of ambiguity that was present in *Magby* or in the substantively similar case of *Mascarenas,* 2000–NMSC–017, ¶¶ 11, 13, 129 N.M. 230, 4 P.3d 1221. Since the definitions for criminal negligence and reckless disregard were incorporated into the instruction, the jury could not have convicted Defendant under a lesser civil standard. To the contrary, adding the negligence language would only serve to reintroduce an ambiguity that the *Magby* court expressly wanted to avoid. We hold that the tendered jury instructions were legally sufficient.

{17} The issues of whether the use of an objective and subjective standard in the same instruction might confuse a jury or violate due process were not preserved. When reviewing for error that has not been preserved, our Supreme Court has held:

> [t]he doctrine of fundamental error should be applied sparingly, to prevent a miscarriage of justice, and not to excuse the failure to make proper objections in the court below. With regard to a criminal conviction, the doctrine is resorted to only if the defendant's innocence appears indisputable or if the question of his [or her] guilt is so doubtful that it would shock the conscience to permit the conviction to stand.

*State v. Reyes,* 2002–NMSC–024, ¶ 42, 132 N.M. 576, 52 P.3d 948 (internal quotation marks and citation omitted). Defendant has not shown how the tendered instructions would put his conviction into doubt so as to result in a miscarriage of justice. Even if he did not know that violently shaking a baby could result in serious harm, there was sufficient evidence for the jury to find that the risk of harm to DT was so substantial and foreseeable that he should have known of the risk he created but that he was wholly indifferent to it. *State v. McCrary,* 100 N.M. 671, 673, 675 P.2d 120, 122 (1984) (holding that where defendant's conduct creates a high degree of risk, subjective knowledge is inferred by circumstantial evidence tending to prove defendant should have realized the risk under the circumstances). "Conscious disregard" is not an element in negligent child abuse. By law, one need only have "reckless disregard" to the consequences in the face of substantial and foreseeable danger. Defendant failed to establish fundamental error.

## Double Jeopardy

{18} Defendant argues that his acquittal of intentional child abuse and subsequent prosecution for negligent child abuse violate the federal constitutional guarantee against double jeopardy: (1) they are the same crime, (2) intentional abuse is a lesser included offense of negligent abuse, and (3)

collateral estoppel prevents the State from relitigating the issue of whether Defendant shook the baby since the jury necessarily decided this fact when it acquitted him of intentional abuse. While Defendant asserts that the New Mexico Constitution affords broader protection against double jeopardy than its federal counterpart to bolster his lesser included offense claim, we find that this analysis was not preserved. *State v. Gomez*, 1997–NMSC–006, ¶¶ 22–23, 122 N.M. 777, 932 P.2d 1 (outlining steps to preserve broader application of state constitution). We thus limit our review to an analysis under the federal constitution.

▇▇▇▇ {19} As a general rule, double jeopardy principles are not implicated when a mistrial is ordered for manifest necessity when the jury is unable to reach a verdict. *State v. Desnoyers*, 2002–NMSC–031, ¶ 33, 132 N.M. 756, 55 P.3d 968. Nonetheless, the double jeopardy clause of the federal constitution does protect a defendant from a second prosecution for the "same offense" after an acquittal or a conviction (multiple prosecutions) and from multiple punishments. *State v. Martinez*, 120 N.M. 677, 678, 905 P.2d 715, 716 (1995). This case falls in the "multiple prosecution" category. We apply a de novo standard of review to the constitutional question of whether there has been a double jeopardy violation. *State v. Andazola*, 2003–NMCA–146, ¶ 14, 134 N.M. 710, 82 P.3d 77.

▇▇▇ {20} Federal and New Mexico state courts apply the *"Blockburger* test" "as the essence of the double jeopardy inquiry" in the context of multiple prosecutions. *State v. Gonzales*, 1997–NMCA–039, ¶ 7, 123 N.M. 337, 940 P.2d 185 (recognizing that the United States Supreme Court, applies *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932) in the context of multiple prosecutions, and concluding that the New Mexico Supreme Court would do the same); *accord State v. Powers*, 1998–NMCA–133, ¶ 29, 126 N.M. 114, 967 P.2d 454 (criminal contempt action and criminal prosecution); *see also State v. Nunez*, 2000–NMSC–013, ¶ 56, 129 N.M. 63, 2 P.3d 264 (applying *Blockburger* as one part of three part tests for double jeopardy in civil forfeiture and criminal prosecution); *accord State*

*ex rel. Schwartz v. Kennedy*, 120 N.M. 619, 626, 904 P.2d 1044, 1051 (1995) (administrative sanction and criminal prosecution). We have also held that statutes that are pled in the alternative, such as in this case, are treated as separate offenses for purposes of our double jeopardy analysis. *State v. Rodriguez*, 113 N.M. 767, 771, 833 P.2d 244, 248 (Ct.App.1992).

▇▇▇ {21} Our Supreme Court has interpreted the *Blockburger* test as a "canon of construction used to guide courts in deciphering legislative intent." *Swafford v. State*, 112 N.M. 3, 9, 810 P.2d 1223, 1229 (1991). New Mexico employs a two-part test under *Blockburger*. The first inquiry is whether the offenses are unitary, that is, "whether the same conduct violates both statutes," or whether the conduct is distinguishable. *Swafford*, 112 N.M. at 13, 810 P.2d at 1233. If the conduct is unitary, the elements of each offense are compared. "[I]f . . . one statute is subsumed within the other, the inquiry is over and the statutes are the same for double jeopardy purposes." *Id.* at 14, 810 P.2d at 1234. Conversely, if each offense requires proof of an additional element that is not present in the other, there is a presumption that the statutes punish distinct offenses and double jeopardy does not apply. *Gonzales*, 1997–NMCA–039, ¶ 7, 123 N.M. 337, 940 P.2d 185; *see Swafford*, 112 N.M. at 14, 810 P.2d at 1234. To succeed in a double jeopardy claim, Defendant must rebut that presumption by

> showing [ ] contrary legislative intent as evidenced by the " 'language, history and subject of the statutes[,]' " by differences in the particular evil addressed by each statute, by a showing that the statutes are usually violated together, by comparison of the punishment inflicted for violating each statute, and by other relevant factors.

*Rodriguez*, 113 N.M. at 772, 833 P.2d at 249 (citation omitted).

{22} Defendant argues that intentional child abuse is a general intent crime that merely requires proof that he committed an act "purposely," or as he framed it, had the "conscious object to engage in the conduct" that is harmful. Negligent child abuse, in his

view, requires a similar intent of reckless disregard or, as he defines it, "consciously engag[ing] in conduct while disregarding the risk." By superficially conflating the elements of intentional and negligent child abuse in this manner, Defendant argues that the two offenses have the same elements. In the alternative, Defendant argues that intentional child abuse is a lesser included offense of criminally negligent child abuse, apparently because negligent child abuse adds an element of reckless disregard whereas intentional child abuse does not require any intent as to the consequences of a defendant's conduct.

{23} There is no dispute that the offending conduct was unitary. Our focus is on the second inquiry—whether one offense is completely subsumed by the other. We suspect that part of Defendant's confusion lies in his reference to cases in which child abuse has been characterized as a strict liability crime that does not require proof of intent. *State v. Trujillo*, 2002–NMCA–100, ¶ 14, 132 N.M. 649, 53 P.3d 909; *State v. Herrera*, 2001–NMCA–073, ¶ 13, 131 N.M. 22, 33 P.3d 22; *State v. Ungarten*, 115 N.M. 607, 609, 856 P.2d 569, 571 (Ct.App.1993); *State v. Leal*, 104 N.M. 506, 509, 723 P.2d 977, 980 (Ct.App.1986); *State v. Fuentes*, 91 N.M. 554, 557, 577 P.2d 452, 455 (Ct.App. 1978); *State v. Lucero*, 87 N.M. 242, 244, 531 P.2d 1215, 1217 (Ct.App.1975). Our first portrayal of child abuse as a strict liability crime was made when New Mexico courts applied a civil negligence standard for negligent child abuse. *See Santillanes*, 115 N.M. at 219, 849 P.2d at 362 (noting New Mexico courts had consistently applied a civil negligence standard under the child abuse statute). Apparently this conclusion was based on our observation that the legislature did not appear to differentiate between intentional or negligent child abuse. *See Lucero*, 87 N.M. at 244, 531 P.2d at 1217. However, the Supreme Court has long since clarified that the child abuse statute is not a strict liability crime in that it contains a mens rea element. *See Santillanes*, 115 N.M. at 218, 849 P.2d at 361 (noting that the Court did not have to consid-

er whether child abuse was a strict liability crime because statute contained mens rea elements). "A strict liability statute ... imposes criminal sanction for an unlawful act without requiring a showing of criminal intent." *Lucero*, 87 N.M. at 244, 531 P.2d at 1217. For a child abuse conviction to lie, the state must prove that the defendant acted with a culpable mens rea, a morally blameworthy mental state or "intent." *Magby*, 1998–NMSC–042, ¶ 10, 126 N.M. 361, 969 P.2d 965; *Santillanes*, 115 N.M. at 218, 849 P.2d at 361.

{24} Child abuse is a general intent crime; unlike a specific intent crime, the statute does not require "proof of intent to do a further act or achieve a further consequence."[1] *See State v. Brown*, 1996–NMSC–073, ¶ 22, 122 N.M. 724, 931 P.2d 69 (explaining the difference between general and specific intent crimes) (internal quotation marks and citation omitted). Nevertheless, the statute does contain a mens rea element, which requires proof that a defendant acted with a culpable mental state: intentionally or criminally negligent. It also contains an *actus reus* element: the "voluntary act" that inflicts serious harm or death to the child.

{25} Our comparison of the statutory elements for intentional and negligent child abuse reveals that each offense contains an element that the other does not: the mens rea element. To prove intentional child abuse, the state must show that defendant intended to commit the wrongful act or the consequence. UJI 14–602. Negligent child abuse requires proof that defendant acted with reckless disregard: (1) defendant knew or should have known that his or her conduct created a substantial and foreseeable risk, and (2) defendant recklessly disregarded and was wholly indifferent to the consequences of his or her conduct and to the welfare and safety of the child. *Id.*

{26} We are unpersuaded by Defendant's attempt to equate the two elements. Defendant seems to confuse the concepts of the *actus reus* element, the voluntary act, with the mens rea, the mental state that our

---

1. Of course intentional child abuse may still include instances where defendant has a specific intent to harm the child. *Herrera*, 2001–NMCA–073, ¶ 20, 131 N.M. 22, 33 P.3d 22.

legislature has deemed to be morally blame-worthy. The child abuse statute punishes defendants for committing a voluntary act that is likely to result in serious harm to the child, such as violently shaking a baby, when it is his or her intent, purpose, or conscious object to engage in a harmful act (shake the baby) or to cause the harmful consequence. Joshua Dressler, *Understanding Criminal Law* 121 (Matthew Bender 2d ed.1999). It also punishes defendants for committing a voluntary act, such as shaking a baby, in a criminally negligent manner when he or she engages in substantial and unjustifiable risk taking. *Id.* at 122. The difference is that intentional abuse requires the jury to focus on the defendant's intended conduct to determine whether it was his or her mind-set to violently shake or harm the child. In contrast, negligent abuse requires the jury to focus on the consequences of that conduct to determine whether the risk of serious harm was sufficiently substantial and unjustified under the circumstances to infer that defendant's mind-set was one of indifference, rather than purpose and grossly contrary to common experience. *See id.* at 113–14. Since each statute requires proof of a different element, we find there is a presumption that the legislature intended to punish these crimes separately. Defendant has provided no evidence of any contrary legislative intent.

{27} We find our conclusion is supported by the plain language of the statute, which requires proof of different elements. The statute also seeks to protect children from two distinct but equally dangerous behaviors: intentionally abusive conduct and unintentional but grossly harmful conduct. The first deters persons who intend harmful acts against children, while the second promotes awareness and prudence when caring for children. It is also clear that these two statutes are mutually exclusive—one cannot commit an intentional act and an unintentional but substantially risky act at the same time, even though the act is voluntary as to both and the evidence may be sufficient to charge both offenses as alternative theories. We thus hold that the crime of intentional child abuse is not the same crime or lesser included crime of negligent child abuse.

{28} Defendant's last argument on this issue is collateral estoppel. Collateral estoppel is an aspect of double jeopardy. *State v. Abril,* 2003–NMCA–111, ¶ 25, 134 N.M. 326, 76 P.3d 644. Defendant bears the burden to prove the factual predicate for collateral estoppel—that the ultimate issue was determined in his favor by the jury. *Id.* ¶ 26. Defendant has failed to establish his claim that to acquit him of intentional child abuse, the jury must have found he did not shake the baby. As we explained, the voluntary act of shaking the baby that results in harm is the *actus reus* element of both negligent and intentional child abuse. The jury could have found that Defendant did not *intend* to shake the baby in a violent manner, but failed to reach a verdict on whether he shook the baby in a *criminally negligent,* albeit violent manner. Hence, collateral estoppel principles do not apply. We find no double jeopardy violation.

### Character Evidence

{29} Defendant claims that the district court abused its discretion by excluding admissible character evidence. Further, Defendant states that the court extended its ruling from the first trial to the second trial "to exclude all evidence offered by [Defendant] concerning his reputation in the community for peacefulness" and that the court "repeatedly excluded the presentation of this evidence."

{30} In truth, the record reveals that the district court excluded specific instances of character evidence, which it ruled were not admissible under Rule 11–404(A) NMRA, to prove that Defendant acted in conformity with any particular trait. Significantly, the court also ruled that Defendant's trait of character for peacefulness was relevant to a prosecution for child abuse based on shaken baby syndrome, and, therefore, admissible under Rule 11–405 NMRA, provided that the testimony was offered in the form of reputation or opinion testimony. The court repeated its ruling in detail throughout the first trial, and, in fact, allowed opinion testimony that Defendant was a good man who treated DT well prior to the incident.

{31} At the start of the second trial, the court reminded counsel:

> I'm going to follow the rules and I'm going to expect each side to follow the rules on that. And, therefore, you will follow the rules relating to character evidence under 404, 405, opinion, reputation and ask questions in that form. And, frankly, as I recall testimony of mom last time, there is a whole lot of stuff like isn't he a nice kid. Ask the proper form of the question [or] I'll sustain the objection every time.... [M]y recollection of her testimony in the previous trial is your questions asked by the defense that would tend to solicit he is a nice kid, he wouldn't do this kind of thing.... And I'm telling you all right now that it's not acceptable. And I would sustain objections on that.... You all open the door on character evidence ... with respect to one of your witnesses, the defense gets to rebut. The defense opens the door with respect to character evidence with respect to [Defendant] if there is any negative character evidence, the State can rebut with any.

Not only is his claim inaccurate, Defendant mysteriously cites no instances in the second trial where he offered, or the court excluded, evidence of his peaceful character. The testimony he cites occurred at the first trial which for obvious reasons was not appealed. Defendant has failed to preserve his objection. *State v. Rojo*, 1999–NMSC–001, ¶ 44, 126 N.M. 438, 971 P.2d 829 (citing principle that the court will not search the record to find whether an issue was preserved).

### Sufficiency of the Evidence

 {32} Defendant restates his double jeopardy arguments as a sufficiency of the evidence argument. He contends that the State presented the same evidence as it presented in the first trial, and all of that evidence led to only one conclusion: the shaking was non-accidental and there was no innocent purpose. Since the jury acquitted him of intentional child abuse, he concludes, the evidence cannot support a conviction for criminal negligence. We need not restate our double jeopardy analysis. Instead we limit our review to the issue of whether there was substantial evidence to support Defendant's conviction for negligent child abuse.

> In reviewing the sufficiency of evidence used to support a conviction, we determine whether substantial evidence exists to support a finding of guilt beyond a reasonable doubt for every element essential to the conviction. We resolve all disputed facts in favor of the State, indulge all reasonable inferences in support of the verdict, and disregard all evidence and inferences to the contrary. Contrary evidence supporting acquittal does not provide a basis for reversal because the jury is free to reject Defendant's version of the facts.

*State v. Wilson*, 2001–NMCA–032, ¶ 34, 130 N.M. 319, 24 P.3d 351 (citations omitted).

{33} At the second trial, the State had the burden to prove that Defendant knew or should have known of the substantial risk that his conduct could result in serious injury or death to DT, and that he recklessly disregarded that risk and was wholly indifferent to it or the child's safety and health. *See* UJI 14–602. The evidence established that prior to 3:20 p.m. on July 24, 2000, DT was a normal and healthy baby. Two hours later, after being in Defendant's sole custody and care, he was not. Medical witnesses testified that DT suffered substantial, serious injuries that were consistent with shaken baby syndrome and that those injuries would manifest shortly after being violently shaken. Although Defendant offered several innocent explanations, the consensus of the medical witnesses was that his explanations were medically unacceptable. He also admitted shaking DT on two occasions. We find that this evidence is sufficient for the jury to convict Defendant of criminally negligent child abuse. *See Wilson*, 2001–NMCA–032, ¶ 37, 130 N.M. 319, 24 P.3d 351 (holding that substantial evidence supported defendant's conviction for negligent child abuse where medical testimony established serious injury to the child resulted from substantial force, defendant was the only person capable of inflicting the injury, he admitted tossing the child onto a bed and that its head hit something, and his explanation was medically unacceptable); *State v. Pennington*, 115 N.M. 372, 383, 851 P.2d 494, 505 (Ct.App.1993)

(holding that circumstantial evidence may support a guilty verdict).

### Findings Required by Section 33–2–34(L)(4)(n)

{34} At sentencing, the district court found that Defendant's conviction for negligent child abuse qualified as a serious violent offense and limited his good time credit in prison to four days per month as authorized by the Earned Meritorious Deductions Act, Section 33–2–34(L)(4)(n) (EMDA). The district court found:

> [DT] was vulnerable, and it is a terrible thing that happened to [him] that he [has] to live with for the rest of his life.... I don't believe that there was a specific intent to do serious harm ... I think it's implicit and literally built [into] the verdict of the jury. There was a finding by the jury beyond a reasonable doubt that what you did is something reasonably likely to cause harm, and a reasonable person would know that. And so I think the earned meritorious good time credit act does apply in the circumstances of this case.

Defendant argues that negligent child abuse is not a serious violent offense as a matter of law. For a crime to qualify under subsection (L)(4)(n), Defendant contends, the district court must find that he acted with "subjective intent or knowledge" of the risk of harm. He concludes that imputing knowledge of the risk to him under an objective standard was a legally insufficient basis to qualify his conviction as a serious violent offense. We review de novo the issue of whether the court applied the correct legal standard under Section 33–2–34(L)(4)(n). *State v. Romero*, 2002–NMCA–106, ¶ 6, 132 N.M. 745, 55 P.3d 441.

{35} Defendant relies heavily on *State v. Morales*, in which we stated that the serious violent offenses listed in subsection (L)(4)(n) were limited to circumstances where the trial judge found the offense was "committed in a physically violent manner either with an intent to do serious harm or with recklessness in the face of knowledge that one's acts are reasonably likely to result in serious harm." 2002–NMCA–016, ¶ 16,

131 N.M. 530, 39 P.3d 747. In making this determination, the trial judge may also consider the resulting harm. *Id.* Defendant isolates our term, "in the face of knowledge," to argue that we require actual knowledge of the risk.

{36} In *Morales*, we construed subsection (L)(4)(n) "to require a finding that a defendant had committed the crime 'in a physically violent manner,' acting either *intentionally or recklessly*, which resulted in serious harm to the victim." *State v. Cooley*, 2003–NMCA–149, ¶ 18, 134 N.M. 717, 82 P.3d 84 (emphasis added). In fact, we recognized that risk-taking knowledge is imputed to a defendant who is convicted of shooting at a dwelling or occupied building, which is a serious violent offense as a matter of law, even though proof of actual knowledge that the building was occupied is not required. *Morales*, 2002–NMCA–016, ¶ 14, 131 N.M. 530, 39 P.3d 747; *see* UJI 14–340 NMRA (indicating that proof that the defendant *knew it was a dwelling* is sufficient). As we often recognize, "the element of intent is seldom susceptible to direct proof and accordingly may be proved by circumstantial evidence." *McCrary*, 100 N.M. at 673, 675 P.2d at 122. Likewise, subjective knowledge can be attributed to a defendant in the case of negligent child abuse when the evidence establishes that the degree of risk was substantial and unjustified so that the defendant should know it was reasonably dangerous to the child's life or health. *See id.* ("[S]ubjective knowledge of risk [is found] by considering what the defendant should realize to be the degree of risk, in the light of the surrounding circumstances.") (internal quotation marks and citation omitted).

{37} Neither do we find any indication that the legislature intended to require subjective knowledge under subsection (L)(4)(n). That subsection identifies "first, second, and third degree" child abuse as a qualifying serious violent offense without restriction. Under Defendant's standard, it would be virtually impossible to find negligent child abuse is a serious violent offense, even if it were committed in the most physically violent manner that resulted in death. *See State v. Padilla*, 1997–NMSC–022, ¶ 6, 123 N.M. 216, 937 P.2d

492 (reviewing court construes statute to avoid absurd or unreasonable results). Such a finding contravenes legislative intent to deter grossly negligent conduct that poses a substantial risk of serious harm to children. *See State v. Shafer*, 102 N.M. 629, 637, 698 P.2d 902, 910 (Ct.App.1985) ("Statutes must be construed according to the purpose for which they were enacted."). The record reveals that the district court made the requisite finding of knowledge and its decision is supported by substantial evidence.

## CONCLUSION

{38} We affirm Defendant's conviction and the district court's determination that negligent child abuse qualified as a serious violent offense under the circumstances of this case.

{39} **IT IS SO ORDERED.**

WE CONCUR: JAMES J. WECHSLER, Chief Judge, and CYNTHIA A. FRY, Judge.