2005-NMCA-126
122 P.3d 1269
**STATE of New Mexico, Plaintiff-Appellee,**

v.

**Sean Ross STEWART, Defendant-Appellant.**

**No. 24,624.**

Court of Appeals of New Mexico.

Aug. 24, 2005.

Certiorari Denied, No. 29,450, Nov. 9, 2005.

502

Patricia A. Madrid, Attorney General, Anita Carlson, Assistant Attorney General, Santa Fe, NM, for Appellee.

John Bigelow, Chief Public Defender, Sheila Lewis, Assistant Appellate Defender, Santa Fe, NM, for Appellant.

*OPINION*

KENNEDY, Judge.

{1} Defendant appeals his convictions for two separate counts of battery against a household member, two counts of aggravated battery, one count of child abuse, and negligent cruelty to animals. His convictions stem from when Defendant, over a five-hour period, alternately slapped, punched, and kicked his girlfriend Lynda Wilkins (Mother), her thirteen-month-old son (Child), and the family's puppy. Defendant argues that his two separate convictions for battery against Mother violated double jeopardy because Defendant's assaults were not sufficiently distinct. Defendant also argues that his convictions of both aggravated battery and child abuse violated double jeopardy because child abuse is a specific type of aggravated battery. Finally, Defendant argues that there was insufficient evidence to convict him of negligent cruelty to animals because the evidence only showed that he acted intentionally when he kicked the puppy.

{2} We hold that Defendant's two counts of battery against a household member were sufficiently distinct because a reasonable jury could conclude, based on the evidence presented at trial, that the assaults occurred at different times and were punctuated by an assault on another victim. We hold that double jeopardy challenges and arguments seeking to invoke the general/specific rule must be analyzed separately. In analyzing the two challenges separately, we hold that insofar as Defendant challenges his convictions of aggravated battery and child abuse under double jeopardy, his numerous acts over the course of the morning were sufficiently distinct to justify at least three counts, if not more. We also hold that the general/specific rule is inapplicable to the statutes at hand and that child abuse under NMSA 1978, § 30–6–1(D) (2004) is not a specific type of misdemeanor aggravated battery under NMSA 1978, § 30–3–5(B) (1969). Finally, we hold that there was sufficient evidence for the jury to find that Defendant committed negligent animal cruelty to animals because he acted with a higher mens rea than required. We affirm Defendant's convictions.

## FACTUAL AND PROCEDURAL HISTORY

{3} At approximately 3:15 a.m. on January 1, 2003, Mother was awakened by the sound of Child screaming. Ten minutes later, upon hearing Child screaming again, she went into her back living room. There, she found Defendant punching Child in the chest. Defendant was telling Child to "shut the fuck up." Mother picked up Child and walked away. Defendant followed and grabbed Child away from her. Defendant started punching Child again as he took Child back to the back living room, cursing at Child. Defendant threw Child on the couch. Mother tried to intervene, asking Defendant to leave. Defendant threw a plate of food at her but missed. At this point, or possibly later, when Mother tried to get Defendant away from Child, Defendant punched her in the chest, once in the stomach, once in the back, and kicked her as she tried to get away. It is unclear whether the punching and kicking occurred at one time or over the course of the morning.

{4} Defendant next started pacing around the house, an activity that went on for some time. Around this time, Defendant also kicked Mother's puppy in the head because the puppy was looking at him. He kicked the puppy a second time while he was walking to the kitchen and said that he would kill the puppy if she looked at him again.

{5} Although Defendant had earlier told Mother not to do so, Mother picked up Child again to calm down the infant. Defendant snatched Child from her, threw Child back on the couch and slapped Child. He again instructed Mother not to touch Child. He then threw Child onto a chair and told Child not to move; when Child kept crying, Defendant began punching Child in the chest. The evidence does not indicate how long this episode of punching lasted.

{6} At approximately 5 a.m. Mother went into the master bedroom to retrieve Child's diaper bag. Mother told Defendant that she was leaving. Defendant cursed at her, blaming her for "trying to save that little bitch," (referring to Child). Defendant told Mother to sit down, got in her face, and threatened to blow up her house. When Mother returned to the back living room where Child still sat in the chair, Defendant taunted her inability to go comfort Child.

{7} Some time later, Defendant walked past Child and kicked Child in the face. Child fell to the floor. When Mother tried to go to Child, Defendant punched her in the jaw. Defendant then picked up Child and threw Child back into the chair. Mother was again told not to touch Child. Defendant put his own children back to bed.

{8} Child remained in the chair until approximately 6 a.m., when Defendant allowed Mother to put Child to bed. Later, Defendant found Child sitting, not lying, in the bed. Defendant grabbed Child by the arm and started punching Child in the chest again. Mother was present but too scared to intervene. She testified that "there was a couple of times where he would punch [Child] and [Child] would like aaaagh, like he couldn't breath[e] he was punching him so hard and he wouldn't stop."

{9} Defendant then grabbed Child and threw Child back into the chair located in the back living room. Defendant kept making trips to the kitchen, finally returning with a steak knife. Defendant started sticking the knife in the couch and remote control. Mother at some point tried to leave, but Defendant would not let her.

{10} At approximately 7 to 7:30 a.m., Mother put Child to bed for the second time. Mother returned to the couch with Defendant. Around 8:15 a.m., she managed to sneak away from the house with Child and her daughter.

{11} On November 13, 2003, a jury convicted Defendant of seven counts: Counts One and Four, battery against a household member (of Mother); Count Two, child abuse (of Child); Count Three, false imprisonment (of Mother); Counts Five and Six, aggravated battery (of Child); and Count Seven, cruelty to animals. Defendant appealed.

## DISCUSSION

### Standard of Review

{12} We review Defendant's double jeopardy and statutory construction arguments de novo. *See State v. McClendon*, 2001–NMSC–023, ¶ 2, 130 N.M. 551, 28 P.3d 1092; *State v. Schoonmaker*, 2005–NMCA–012,

¶ 19, 136 N.M. 749, 105 P.3d 302. Insofar as Defendant challenges the sufficiency of the evidence, "we consider the evidence in the light most favorable to the State, resolving all conflicts and indulging all permissible inferences in favor of the verdict." *State v. McGee,* 2004–NMCA–014, ¶ 6, 135 N.M. 73, 84 P.3d 690. We do not re-weigh the evidence or substitute our judgment for the jury's. *Id.*

### Double Jeopardy: Multiple Convictions of the Same Charge

■ {13} Defendant challenges his conviction of two counts of battery against a household member as violating double jeopardy. *See* NMSA 1978, § 30–3–15 (2001) (defining battery against a household member); N.M. Const. art. II, § 15 (stating New Mexico's double jeopardy protections). This is a unit of prosecution challenge. *See State v. Boergadine,* 2005–NMCA–028, ¶ 14, 137 N.M. 92, 107 P.3d 532 (stating that there are two types of double jeopardy multiple punishment issues: "multiple convictions under one statute (unit of prosecution cases) and multiple convictions under multiple statutes for the same course of conduct (double description cases)"). A unit of prosecution challenge uses a two-step inquiry. *Id.* ¶ 15. The first question is whether the unit of prosecution is clearly defined by the statute at issue. *Id.* The second question is whether the charged acts were sufficiently distinct. *Id.* Only if the second question is answered in the negative do we then apply the rule of lenity. *Id.*

■ {14} Neither party addresses whether a unit of prosecution is clearly defined in Section 30–3–15. *See In re Doe,* 98 N.M. 540, 541, 650 P.2d 824, 825 (1982) (stating that courts should not address issues that the parties do not raise on appeal). We therefore ask whether Defendant's acts were sufficiently distinct to warrant two counts of battery against a household member. *See Boergadine,* 2005–NMCA–028, ¶ 15 (setting forth the two-part inquiry for unit of prosecution challenges). This determination uses a flexible set of factors including: "(1) temporal proximity of the acts; (2) location of the victim(s) during each act; (3) existence of an intervening event; (4) sequencing of acts; (5) defendant's intent as evidenced by his conduct and utterances; and (6) the number of

victims." *Id.* ¶ 21 (internal quotation marks and citation omitted); *see also Herron v. State,* 111 N.M. 357, 361, 805 P.2d 624, 628 (1991) (stating the same test); *State v. Morro,* 1999–NMCA–118, ¶ 19, 127 N.M. 763, 987 P.2d 420 (same). "We may also consider whether Defendant's acts were performed independently of the other acts in an entirely different manner, or whether such acts were of a different nature." *Boergadine,* 2005–NMCA–028 ¶ 21 (internal quotation marks and citation omitted). Using the factors set forth above, we address Defendant's conviction of two counts of battery against a household member.

### Defendant's Acts Were Distinct and Support Two Counts of Battery Against a Household Member

■ {15} The first factor we analyze is the temporal proximity of the two charged events. *See id.* In this case, we will analyze the first factor with the fourth factor of the sequencing of acts. *See id.* The first jury instruction for battery against a household member said that "[D]efendant intentionally touched or applied force to [Mother] by slapping/punching her in the face." The second instruction said that "[D]efendant intentionally touched or applied force to [Mother] by punching her in the chest and about the body." As Defendant points out, Mother's testimony about when certain events occurred is unclear. She testified that after Defendant had kicked Child in the face, she went to help Child and Defendant punched her in the jaw. She also testified about Defendant punching and kicking her when she was trying to get Defendant away from Child.

{16} It is somewhat unclear when this hitting and kicking occurred or if it occurred all at once. However, it appears that Mother referred to the earlier part of the morning. She testified that after she first found Defendant punching Child at approximately 3:25 a.m., she picked up Child, walked away, and Defendant then tugged Child away from her. After Defendant threw Child back on the couch, she tried to get Defendant off Child. She then repeatedly testified to being too scared to intervene in Defendant's subse-

quent assaults on Child, and to Defendant taunting her for not being able to intervene. A jury could reasonably infer that Mother's fear of intervening, a fear significant enough to prevent her from helping Child, must have stemmed from Defendant punching and kicking her earlier. *See Swafford v. State,* 112 N.M. 3, 14, 810 P.2d 1223, 1234 (1991) (permitting multiple punishments "where examination of the facts presented at trial establish that the jury reasonably could have inferred independent factual bases for the charged offenses").

{17} That the factual basis for the two separate charges of battery against a household member were temporally discrete is also supported by the way that Mother's testimony was elicited. Mother testified that Defendant punched her in the jaw. The State then asked her whether that punch was the only time that Defendant had touched her during the course of these events. She replied "[n]o," meaning that sometime during a four-hour period, Defendant had struck her again. This span of time was from approximately 3:25 a.m., the time Mother first witnessed Defendant punching Child in the chest, and 7 or 7:30 a.m., the last time Defendant allowed her to put Child to bed. Mother then related to the jury "[w]hat else happened" between them as follows: "Between me trying to get [Defendant] away from [Child], trying to separate them, I got punched in my chest and once in my stomach and once in my back. I got kicked on my butt as I was trying to get away from him." When asked about the chronology, she did not remember. She said: "The only thing that I can say for sure when it happened is when I got punched in the jaw from him kicking [Child] off the chair." Mother knew exactly when she got punched in the jaw, but not the other exact time or times that Defendant struck her, which indicates that the two sets of events were temporally discrete. *See id.*

{18} The next factor is the location of the victim during each act. *Boergadine,* 2005–NMCA–028, ¶ 21. Defendant argues that because the first blows occurred between the back living room and the kitchen, and the punch in the jaw occurred in the back living room itself, this movement is *de minimis* compared to the movement described in *State v. Mares,* 112 N.M. 193, 200, 812 P.2d 1341, 1348 (Ct.App.1991). There, we said that while the continuing struggle took place "in the car, on the ground, and in the bushes, we cannot determine from the record exactly how far [the] defendant transported the victim" during the assault. *Id.* We agree that the lack of a significant change in location in the case before us weighs in favor of Defendant's argument that the two counts of battery against a household member were not sufficiently distinct.

{19} However, the other factors do not weigh in Defendant's favor. The third factor is the existence of any intervening events. *Boergadine,* 2005–NMCA–028, ¶ 21. Our Supreme Court has considered a struggle to be a significant intervening act. *See State v. Cooper,* 1997–NMSC–058, ¶ 61, 124 N.M. 277, 949 P.2d 660. There was evidence of several acts between the acts which formed the bases for the two counts of battery against a household member. Mother testified that after Defendant had kicked Child in the face, she went to help Child and Defendant punched her in the jaw. She then testified that at some other time Defendant punched and kicked her when she was trying to get Defendant away from Child. Between each of these acts is an assault on Child. We hold that in this case the assault on Child was a significant intervening event. *See Boergadine,* 2005–NMCA–028, ¶ 21. We also hold that this intervening assault represents an additional victim under the sixth factor of our analysis. *See id.*

{20} The fifth factor is "[D]efendant's intent as evidenced by his conduct and utterances." *Id.* (internal quotation marks and citation omitted). Defendant argues that in order to convict him of two distinct crimes, there must be sufficient evidence of "a break and a reformulation of intent." For support of this argument, Defendant relies on *State v. Handa,* 120 N.M. 38, 897 P.2d 225 (Ct.App. 1995). There, in considering whether firing three shots was sufficient to uphold two separate and distinct offenses, we said that we required "proof that each shot was a separate and distinct act." *Id.* at 44, 897 P.2d at 231. There, the "three shots were not separate and considered distinct acts but part of a single contact arising from a single, sus-

tained intent. Thus, each shot was accompanied by one protracted intention." *Id.* (internal quotation marks and citation omitted). The defendant's intent was one factor among many. *See id.* (analyzing other factors in deciding whether the acts were sufficiently distinct). Also, we again note the existence in this case of an intervening assault on a different victim. The jury in this case found that Defendant had the requisite intent to commit those assaults against the different victims. Therefore, we hold that, at a minimum, Defendant's conduct in assaulting Child in between his first and second assaults on Mother evidenced that he did not have "a single, sustained intent" to assault her. *See id.* This fact also justifies holding that Defendant's acts were performed independently of each other. *See Boergadine,* 2005–NMCA–028, ¶ 21. These factors considered, we therefore hold that in total, the evidence supported two separate charges of battery against a household member. *See Swafford,* 112 N.M. at 14, 810 P.2d at 1234 (permitting multiple punishments "where examination of the facts presented at trial establish that the jury reasonably could have inferred independent factual bases for the charged offenses").

### Double Jeopardy Challenges and General/Specific Challenges Require Separate Analyses

{21} Defendant argues that convicting him of both aggravated battery and child abuse violated double jeopardy because, he claims, "child abuse is a specific type of aggravated battery." Defendant asserts that the State only presented evidence that Defendant acted "intentionally, [and] cruelly punished" Child, and presented "no evidence of criminal negligence." He further argues that the legislature never "intended the intentional infliction of blows to a child to be charged and punished as both an aggravated battery charge and as child abuse." Finally, Defendant asserts that his conduct was unitary and that we should apply the rule of lenity because, he claims, child abuse is always a "continuing crime."

{22} Our Supreme Court discussed the general/specific rule in *State v. Cleve,* 1999–NMSC–017, 127 N.M. 240, 980 P.2d 23. "[I]f two statutes, one general and one special, punish the same criminal conduct, the special

law operates as an exception to the general law to the extent of compelling the state to prosecute under the special law." *Id.* ¶ 17. Our Supreme Court later clarified that the application of the general/specific rule requires a separate inquiry than that used for double jeopardy challenges. *See State v. Santillanes,* 2001–NMSC–018, ¶ 14, 130 N.M. 464, 27 P.3d 456. Insofar as Defendant raises double jeopardy issues, we address those first before turning to his challenges invoking the general/specific rule.

### Double Jeopardy: Double Description

{23} The first prong of analyzing Defendant's second double jeopardy challenge requires us to ask "whether the conduct underlying the offenses is unitary, *i.e.,* whether the same conduct violates both statutes." *Swafford,* 112 N.M. at 13, 810 P.2d at 1233. Conduct is not unitary "if the defendant commits two discrete acts . . . separated by sufficient indicia of distinctness." *Id.* This inquiry uses the same factors set forth above in our unit of prosecution double jeopardy analysis. *Compare State v. Meadors,* 121 N.M. 38, 49–50, 908 P.2d 731, 742–43 (1995) (applying the *Herron* factors in a double description case), *with Boergadine,* 2005–NMCA–028, ¶ 21 (applying the *Herron* factors in a unit of prosecution case). Furthermore, "if the conduct is separate and distinct, inquiry is at an end." *Swafford,* 112 N.M. at 14, 810 P.2d at 1234 (assuming that conduct was unitary and proceeding to the next prong of the inquiry); *see also Cleve,* 1999–NMSC–017, ¶ 30 n. 2 (same).

{24} Here, the jury was instructed that in order to find Defendant guilty of child abuse under Count Two, it had to find that Defendant acted intentionally when he "caused [Child] to be placed in a situation which endangered the life or health of [Child] OR caused [Child] to be cruelly punished." The jury was also instructed that in order to find Defendant guilty of aggravated battery under Count Five, it had to find that "[D]efendant intentionally touched or applied force to [Child] by punching him in the chest; . . . [D]efendant intended to injure [Child]; . . . [D]efendant caused painful temporary disfigurement." The instruction for Count Six was

identical to the instruction for Count Five except that it alleged that Defendant had committed aggravated battery "by punching and/or kicking [Child] in the face." We hold that all three of these counts were sufficiently distinct to warrant three separate charges, and might have warranted even more.

{25} At approximately 3:25 a.m., Mother discovered Defendant punching Child in the chest. Numerous intervening events and different conduct followed, including: Mother rescuing Child, a tug-of-war between Mother and Defendant over Child, Defendant beginning to hit Child again as he held Child up in the air, Defendant throwing a plate of food at Mother, Defendant's pacing throughout the house, Defendant preventing Mother from going to Child, Defendant complaining about how Mother spoiled Child, and Defendant waking up his own children and instructing them to gather their belongings. Mother then picked up Child to comfort him. Defendant saw Mother holding Child, snatched Child away, threw him on the couch and slapped him. The first incident of punching Child in the chest was sufficiently distinct from the later slap to have warranted convicting Defendant of aggravated battery under Count Five and child abuse under Count Two. We also note there was another later and sufficiently distinct incident of Defendant punching Child in the chest. While Defendant's children were by this time waiting in the hallway after having gathered their belongings, Defendant threw Child into a chair located in the back living room. Defendant told Child not to move and Child kept crying, so Defendant kept punching him in the chest. This was at approximately 5:30 a.m. This act alone is sufficiently displaced by time, Defendant's conduct, and intervening events to be considered a distinct act. A jury could have reasonably selected one of the two chest-punching incidents to justify aggravated battery under Count Five, and selected between the remaining chest-punching incident and the slap to have justified child abuse under Count Two.

{26} More events followed the events justifying the first two counts that additionally justified another count of aggravated battery under Count Six. After the above events, Defendant went into the master bedroom. Mother came into the room to get Child's diaper bag. She told Defendant that she was leaving. Defendant replied, "[a]nd don't you think you should have fucking thought about that before you started all this shit trying to save that little bitch[?]" Defendant told Mother to sit down or she would make the situation worse, and did so face-to-face. He then threatened to blow up her house, saying that if he and his children would not have a place to live, neither would she. Also, while walking from one room to the other, Defendant kicked the puppy in the head because the puppy was looking at him. On his way back to the kitchen, Defendant kicked the puppy again and told Mother that if the puppy looked at him again, he would kill the puppy. Mother then put the puppy outside. It is only after these events that Defendant walked past Child and kicked him in the face, causing Child to fall to the floor with a bloody nose. This event is sufficiently distinct under the test laid out above to have warranted the separate charge of aggravated battery in Count Six. *See Boergadine*, 2005–NMCA–028, ¶ 21 (setting forth factors in considering whether charged acts are distinct).

{27} Following Defendant kicking Child in the face, numerous events followed that might have also justified child abuse (under Count Two), aggravated battery (under Count Five), or even additional counts which the State could have brought (since as discussed above, we found three distinct acts even before Child was kicked in the face). *See, e.g., Cleve*, 1999–NMSC–017, ¶ 26 (noting "the judiciary's longstanding deference to prosecutorial discretion"). For example, there was evidence that Child might have lost consciousness momentarily after Defendant kicked him in the face. There was also evidence that Defendant had hit Child so hard in the chest that he damaged Child's liver. However, Defendant would not allow Mother to leave, thereby preventing her from getting medical care for Child until 10 a.m., nearly seven hours after Defendant first hit Child in the chest.[1] The jury instruction for Count Two also allowed the jury

---

1. Mother testified that she did not have either a phone or a vehicle.

to convict Defendant if he caused Child to be "placed in a situation that may [have] endanger[ed][his] life or health." *See* § 30–6–1(D)(1). Additionally, sometime after Defendant kicked Child, he allowed Mother to put Child to bed around 6 a.m. However, upon discovering that Child was sitting, not lying, in bed, he again started punching Child in the chest. Defendant took Child back to the living room, throwing Child on the floor and causing the back of Child's head to strike the floor. Defendant then went to the kitchen and returned with a steak knife six to seven inches long, which he proceeded to use to stab the couch and remote control. There were numerous sufficiently distinct acts in this case to have justified Defendant being charged with three separate counts. *See, e.g., State v. Guilez*, 2000–NMSC–020, ¶ 13, 129 N.M. 240, 4 P.3d 1231 ("The act required to commit child abuse was completed, although continuing, before the act of reckless driving began. Under our cases this conduct is not unitary."). Since *Swafford* instructs us that "if the conduct is separate and distinct, inquiry is at an end," we need not engage in further analysis. *Swafford*, 112 N.M. at 14, 810 P.2d at 1234.

### Sufficient Evidence of Negligent Cruelty to Animals

■ {28} Defendant argues that there was insufficient evidence to show that he negligently mistreated an animal under NMSA 1978, § 30–18–1(B) (2001), because all the evidence showed that he intentionally mistreated the puppy under Section 30–18–1(E) (defining extreme cruelty to animals as "intentionally or maliciously torturing" or injuring an animal). The jury was instructed that in order to convict Defendant of negligent cruelty to animals, it had to find that "[D]efendant did negligently mistreat a puppy by kicking it in the head and body." The jury was instructed that criminal negligence is acting "with willful disregard of the rights or safety of others and in a manner which endangered" the puppy. *See* UJI 14–133 NMRA.

{29} Mother testified that when Defendant was walking around her house, he kicked her puppy in the head because the puppy was looking at him. Mother testified that:

[Defendant] kicked [the puppy], he kicked her once and he walked towards the master bedroom and he kicked her so hard her head was down like this and her tongue was hanging out of her mouth. And, you know, she shook it off the first time and then he came back on his way back into the kitchen, she was looking at him again so he kicked her again and it took her like a little bit longer to snap out of the second kick and he said if she fucking looks at him again, he was going to kill her. So I had to put her outside.

Defendant argues that the jury may not, on this evidence, convict him of being criminally negligent. We disagree.

{30} The question is not whether the evidence is sufficient to support a conviction for a different charge, but whether the evidence was sufficient to show that Defendant acted with willful disregard for the puppy's safety. *See id.* In judging the sufficiency of evidence to support a conviction, "[w]e view the evidence in the light most favorable to supporting the verdict and resolve all conflicts and indulge all permissible inferences in favor of upholding the verdict." *State v. Apodaca*, 118 N.M. 762, 765–66, 887 P.2d 756, 759–60 (1994). We then ask whether, in this light, the evidence "could justify a finding by any rational trier of fact that each element of the crime charged has been established beyond a reasonable doubt." *Id.* at 766, 887 P.2d at 760 (internal quotation marks and citations omitted).

{31} Defendant relies on *State v. Jacobs*, 102 N.M. 801, 701 P.2d 400 (Ct.App.1985), for the proposition that when the evidence shows intentional conduct, a conviction for criminally negligent conduct cannot stand. This interpretation is too broad. The issue in that case was whether the evidence was sufficient to show negligent arson. *Id.* at 803, 701 P.2d at 402. We held that there was no evidence of damage to nearby businesses or homes as required by the negligent arson statute, NMSA 1978, § 30–17–5(B) (1970). *Jacobs*, 102 N.M. at 803, 701 P.2d at 402. We also noted that the evidence in that case showed that the defendant had the specific intent required for intentional arson. *Id.; see* § 30–17–5(A) (requiring that the fire be

started "with the purpose of destroying or damaging any building" or another's property). General criminal intent, i.e., acting deliberately and intentionally, was not at issue there. *See* UJI 14–1701 NMRA Committee commentary (stating that the "willful or malicious" mens rea for arson has been equated with "deliberate and intentional or the like"). Here, on the other hand, extreme cruelty to animals does not have a specific intent element. *See* § 30–18–1(E). The evidence was sufficient here to show that Defendant acted with willful disregard for the puppy's safety because, as Defendant concedes, he acted intentionally in kicking the puppy.

{32} Defendant appears to argue that all the evidence in this case tended to show that he acted with general criminal intent instead of general criminal negligence. General criminal intent has been defined as acting "intentionally," which in turn has also been termed acting "purposely." *See* UJI 14–141 NMRA; UJI 14–610 NMRA. Criminal negligence, on the other hand, has been equated with recklessness. *See Jacobs*, 102 N.M. at 803, 701 P.2d at 402. A few jury instructions specific to certain criminal negligence crimes use the phrases "wholly indifferent to the consequences" and "reckless disregard." *See, e.g.*, UJI 14–1704 NMRA (defining negligence in the context of arson); UJI 14–602 NMRA (defining negligence in the context of criminal child abuse). The jury instruction for general criminal negligence, used in this case, defines criminal negligence and recklessness as acting with "willful disregard of the rights or safety of others." UJI 14–133. The question then is whether evidence that a defendant acted intentionally, purposely, or deliberately, in harming an animal, is sufficient to establish that the defendant acted with "willful disregard" for that animal's safety. For purposes of the animal cruelty statute, we hold that it is.

■ {33} Most of the case law in New Mexico has been focused on the difference between ordinary civil negligence and criminal negligence. *See, e.g., Santillanes v. State*, 115 N.M. 215, 218–23, 849 P.2d 358, 361–66 (1993). Here, we are asked to focus on the difference between criminal negligence/recklessness and intentional/purposeful conduct. At least one other jurisdiction has stated that, "[t]he Model Penal Code provides that when recklessness suffices to establish an element, such element also is established if a person acts purposely or knowingly." *Simmons v. State*, 72 P.3d 803, 813 (Wyo.2003) (internal quotation marks and citation omitted); *see also* 1 Wayne R. LaFave, *Substantive Criminal Law* § 5.4(f) n. 40.1 (2d ed. Supp.2005). Considering the extent to which New Mexico has relied upon the Model Penal Code to frame the distinction before us, we find this reasoning compelling. *See, e.g.*, UJI 14–1704 (Committee comment) (citing the Model Penal Code with approval). "When [recklessness] suffices to establish an element, such element also is established if a person acts purposely or knowingly." *Model Penal Code* § 2.02(5) at 226 (Official Draft 1962).

> Subsection (5) makes it unnecessary to state in the definition of an offense that the defendant can be convicted if it is proved that he was *more* culpable than the definition of the offense requires. Thus, if the crime can be committed recklessly, it is no less committed if the actor acted purposely.

*Id.* explanatory note cmt. at 228; *see also Simmons*, 72 P.3d at 813–14. We hold that where, as here, Defendant concedes that he acted purposely, i.e. "it is his conscious object to" injure an animal, this is sufficient evidence to establish that he had a "willful disregard" for that animal's safety. *See Model Penal Code* § 2.02(2)(a)(i) at 225; UJI 14–133.

**CONCLUSION**

■ {34} We hold that Defendant's two counts of battery against a household member along with his two counts of aggravated battery with one count of child abuse were sufficiently distinct to warrant separate convictions. We also hold that the general/specific rule is inapplicable to the statutes at hand and that child abuse under Section 30–6–1(D) is not a specific type of misdemeanor aggravated battery under Section 30–3–5(B). Finally, we hold that there was sufficient evidence for the jury to convict Defendant of negligent cruelty to animals insofar as he

acted with a higher mens rea than the statute required. We therefore affirm.

{35} **IT IS SO ORDERED.**

WE CONCUR: MICHAEL D. BUSTAMANTE, Chief Judge, and JONATHAN B. SUTIN, Judge.