This decision of the New Mexico Court of Appeals was not selected for publication in the New Mexico Appellate Reports. Refer to Rule 12-405 NMRA for restrictions on the citation of unpublished decisions. Electronic decisions may contain computer-generated errors or other deviations from the official version filed by the Court of Appeals.

## IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**No. A-1-CA-37170**

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.

**DEBRA CLOPTON,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF SANTA FE COUNTY**
**Mary Marlowe Sommer, District Judge**

Hector H. Balderas, Attorney General
Eran Sharon, Assistant Attorney General
Santa Fe, NM

for Appellee

Bennett J. Baur, Chief Public Defender
Gregory B. Dawkins, Assistant Appellate Defender
Santa Fe, NM

for Appellant

### MEMORANDUM OPINION

**BOGARDUS, Judge.**

**{1}** Defendant Debra Clopton appeals her convictions for twenty-two misdemeanor counts of cruelty to animals, in violation of NMSA 1978, Section 30-18-1(B) (2007), and one misdemeanor count of practicing veterinary medicine without a license, in violation of NMSA 1978, Section 61-14-18 (1999, amended 2017).

**{2}**     Defendant raises seven issues on appeal,[1] arguing (1) the multiple cruelty to animals convictions subjected her to double jeopardy; (2) there was insufficient evidence to support those convictions; (3) the district court improperly refused her request for a jury instruction defining "negligently," as that word is used in the cruelty to animals statute; (4) the statute prohibiting the unlicensed practice of veterinary medicine is unconstitutionally vague; (5) the district court improperly limited her ability to testify and to cross-examine the expert witness at trial; (6) the district court improperly found her competent to stand trial; and (7) she was denied effective assistance of counsel at trial. Defendant further asserts that the cumulative error in her jury trial warrants reversal. Finding no error, we affirm.

**BACKGROUND**

**{3}**     The charges against Defendant came about when her neighbors complained to the Santa Fe County Sheriff's Office Animal Control Division about excessive dog barking coming from her five-acre property. While responding to one of the complaints, an animal control officer saw approximately twenty-one dogs in Defendant's yard. Defendant, who was trained in veterinary medicine, told the officer that she was treating some of the dogs; he then informed her that since her license to practice veterinary medicine had been revoked, she could not engage in that treatment. He and the other officers with him left and prepared a warrant to search the property. They coordinated with the Doña Ana County Animal Cruelty Task Force to assist with a planned intervention at Defendant's property.

**{4}**     A week later, a team of law enforcement and animal control officers returned to execute the warrant, further investigate the situation, and remove the dogs. When the officers arrived, they saw eight dogs in the yard acting aggressively and fighting one another, with the stronger dogs attacking the weaker ones. The officers captured those dogs and put them in kennels.

**{5}**     Wearing protective gear and respirators, the officers then entered Defendant's double-wide mobile home, where they found dozens more dogs that were acting aggressively toward each other, as well as toward the officers. The officers observed medicine, including rabies vaccines, in the house, along with medical equipment commonly used by veterinarians. They saw trash and feces on the floors and detected strong odors of feces, urine, and ammonia. One officer described the feces as covering a majority of the floor and as having been stepped in and tracked throughout the house by the dogs; he also said that the odor in the house burned his eyes and, even with his respirator on, took his breath away. Some of the dogs inside were emaciated, some were unable to stand and walk, some were suffering from neurological conditions, and

---

[1] At the outset, we remind Defendant that litigants are encouraged to limit the number of issues they choose to raise on appeal in order to ensure that those presented are adequately argued and are supported both by authority and properly cited facts in the record. *See Rio Grande Kennel Club v. City of Albuquerque*, 2008-NMCA-093, ¶¶ 54-55, 144 N.M. 636, 190 P.3d 1131 ("[W]e encourage litigants to consider carefully whether the number of issues they intend to appeal will negatively impact the efficacy with which each of those issues can be presented.").

some were injured or otherwise disabled. There were dogs in kennels too small for them that had no food or water. One officer said he saw no bowls with dog food or water inside the house. At one point, some dogs were trampled by a group of other dogs moving toward the back door; the door eventually broke, and some dogs escaped.

**{6}** While the officers were inside, one of the members of the team, veterinarian Patricia Norris, was examining the captured dogs in a mobile forensic van parked on the property. After the dogs, forty-eight in all, were collected, they were taken to the animal shelter, where Dr. Norris periodically checked on them. Some were eventually euthanized and others were treated for illness and wounds.

**{7}** Defendant was arrested and charged with twenty-two counts of animal cruelty, one for each of twenty-two dogs, and one count of practicing veterinary medicine without a license. The jury returned guilty verdicts on all counts. For each of the animal cruelty counts, the jury was instructed that, to find guilt, the State had to prove beyond a reasonable doubt that (1) "Defendant negligently mistreated, injured, killed without justification, or tormented [the particular dog associated with the count];" or that (2) "Defendant abandoned or failed to provide necessary sustenance to [that dog.]"

## DISCUSSION

### I.     Defendant's Twenty-Two Animal Cruelty Convictions Do Not Violate Double Jeopardy

**{8}** Defendant first contends that the district court erred by not dismissing, under principles of double jeopardy, all but one of her twenty-two convictions for animal cruelty. She argues that she should not be "punished [twenty-two] times for the same behavior." The State disputes Defendant's ultimate conclusion, but does not dispute Defendant's characterization that the same behavior underlies the convictions. We therefore analyze this issue with an understanding that the convictions were based on a single course of conduct engaged in by Defendant.

**{9}** The Fifth Amendment to the United States Constitution and Article II, Section 15 of the New Mexico Constitution protect defendants from "multiple punishments for the same offense." *State v. Cooper*, 1997-NMSC-058, ¶ 52, 124 N.M. 277, 949 P.2d 660 (internal quotation marks and citation omitted). Defendant's case constitutes one in the "unit of prosecution" line of double jeopardy-multiple punishment cases; in each such case, "the defendant has been charged with multiple violations of a single statute based on a single course of conduct." *State v. Ramirez*, 2018-NMSC-003, ¶ 45, 409 P.3d 902 (internal quotation marks and citation omitted). "The relevant inquiry" in a unit of prosecution case "is whether the [L]egislature intended punishment for the entire course of conduct or for each discrete act. The only basis for dismissal is proof that [the defendant] is charged with more counts of the same statutory crime than is statutorily authorized." *Id.* (alteration, internal quotation marks, and citations omitted). "Our review of whether a double jeopardy violation occurred is a legal question subject to de novo review." *State v. Lente*, 2019-NMSC-020, ¶ 14, 453 P.3d 416.

**{10}** To determine whether Defendant's right to freedom from double jeopardy was infringed, we ask whether the Legislature intended for a person who engages in a single course of conduct proscribed by the animal cruelty statute to receive one conviction and sentence per animal affected by that conduct—or one conviction and sentence, no matter how many animals were affected. We resolve that question using a two-part test. First, we "analyze the statute at issue to determine whether the Legislature has defined the unit of prosecution." *State v. Swick*, 2012-NMSC-018, ¶ 33, 279 P.3d 747. "The plain language of the statute is the primary indicator of legislative intent." *Ramirez*, 2018-NMSC-003, ¶ 47 (internal quotation marks and citation omitted). In addition to the statute's wording, we may examine the statute's purpose. *Swick*, 2012-NMSC-018, ¶ 33. "If the unit of prosecution is clear from the language of the statute, the inquiry is complete." *Id.* If not, "we move to the second step, in which we determine whether [the] defendant's acts are separated by sufficient indicia of distinctness to justify multiple punishments under the same statute." *Ramirez*, 2018-NMSC-003, ¶ 47 (internal quotation marks and citation omitted).

**{11}** In relevant part, the animal cruelty statute provides that "[c]ruelty to animals consists of a person: (1) negligently mistreating, injuring, killing without lawful justification or tormenting an animal; or (2) abandoning or failing to provide necessary sustenance to an animal under that person's custody or control." Section 30-18-1(B). Notably, the statute lacks an express statement identifying the offense's unit of prosecution. *See, e.g.*, *State v. Alvarez-Lopez*, 2004-NMSC-030, ¶ 41, 136 N.M. 309, 98 P.3d 699 (identifying the statutory language "[e]ach separate incident of embezzlement or conversion constitutes a separate and distinct offense" as one example of a clear expression of the unit of prosecution).

**{12}** Nevertheless, the statute implies that the Legislature intended punishment under it to correspond to the number of animals a person subjects to cruelty. The statute uses the singular term "an animal" in describing the crime, rather than the plural, "one or more animals." This choice indicates that the unit of prosecution corresponds to each animal subjected to cruelty, not to a single course of conduct that harms multiple animals. *See Ramirez*, 2018-NMSC-003, ¶ 53 ("It is well established . . . that where a statute prohibits the doing of some act to a victim specified by a singular noun, 'a person' for example, then 'the person' is the unit of prosecution."). The choice further expresses a desire to not assign only one unit of prosecution to a single course of conduct that results in harm to multiple animals. *See id.* As written, the statute is complete and makes sense, and so we will not read into it words not there. *See State v. Lopez*, 2011-NMCA-071, ¶ 10, 150 N.M. 34, 256 P.3d 977. In short, the statute's plain language suggests that the Legislature intended the offense's unit of prosecution to correspond to the number of animals subjected to cruelty, not to an episode of conduct resulting in cruelty to any number of animals.

**{13}** A somewhat broader look at the animal cruelty statute supports this interpretation by revealing that a person's conduct, though relevant, is not the focus of the offense. *See generally Ramirez*, 2018-NMSC-003, ¶¶ 51-52 (analyzing the unit of prosecution for child endangerment and considering that the child endangerment statute's focus is

the prohibition, not the consequences, of conduct). That is, the target of the animal cruelty statute is not risky or potentially deleterious conduct, the consequences of which carry secondary, if any, import. If it were, the number of animals affected by that conduct would be less relevant. The statute's proscribed conduct is instead bound to its consequence: every time the offense is committed, the result sought to be prevented—the mistreatment, injury, killing, tormenting, abandonment, or undernourishment of an animal—ensues. It follows that the focus of the offense is its result: harm to animals.

**{14}** Therefore, if two animals have been subjected to harm, two results sought to be prevented have occurred, and two units of prosecution therefore arise. This is the case regardless of whether that harm was caused by a person's single course of conduct.

**{15}** Because we conclude that the statutory language makes the unit of prosecution clear, we need not continue to the second step in the unit-of-prosecution test in order to conclude that Defendant's conduct toward each dog was a discrete act constituting one offense, and thus that Defendant's multiple punishments do not violate her double jeopardy rights.

## II. The Evidence Was Sufficient to Support Defendant's Convictions for Animal Cruelty

**{16}** Defendant next argues that the evidence presented at trial was insufficient to support her convictions for animal cruelty. When reviewing such a claim, we consider "whether substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilt beyond a reasonable doubt with respect to every element essential to a conviction." *State v. Baroz*, 2017-NMSC-030, ¶ 9, 404 P.3d 769 (internal quotation marks and citation omitted). "Substantial evidence is relevant evidence that a reasonable mind might accept as adequate to support a conclusion." *Id.* (internal quotation marks and citation omitted). On review, we "resolve all disputed facts in favor of the [s]tate, indulge all reasonable inferences in support of the verdict, and disregard all evidence and inferences to the contrary." *Id.* (internal quotation marks and citation omitted). We further note that the jury instructions used at trial become the law of the case against which the sufficiency of the evidence is measured. *State v. Arrendondo*, 2012-NMSC-013, ¶ 18, 278 P.3d 517. Here, the jury instructions directed the jury to find Defendant guilty of each count of animal cruelty if the jury found, in relevant part, that she (1) "negligently mistreated, injured, killed without justification, or tormented [the particular dog associated with the count]"; or (2) "abandoned or failed to provide necessary sustenance to [that dog.]"

**{17}** Defendant bases her claim of insufficiency on the lack of causation. Specifically, she argues that "no evidence was presented as to when [Defendant] received each dog" and that, consequently, it was "just as reasonable to conclude that she had taken in some dogs on the day before the police raid as it [was] to conclude that she had taken the dogs in weeks or months earlier[.]" Defendant then points out that she could not reasonably have restored the dogs to health in a single day. She also makes the

point that there was no evidence as to the condition of each dog when she received it, and so it was possible that the dogs' conditions improved while in her care.

{18}    Defendant's own testimony, however, undermines her argument. Defendant testified to having had ten of the dogs when she moved to the property in early to mid-February and to having acquired thirty-two more dogs over the following two to four weeks. In other words, according to Defendant, she had forty-two dogs for at least three weeks before law enforcement removed the dogs on April 1.[2]

{19}    Further, Defendant's argument is premised on a mistaken presumption that to find cruelty to a given dog, the jury had to find that she caused its specific injury or affliction or caused its condition to worsen while the dog was in her care. The jury instructions—defining the law of the case—did not say this. Instead they referred, in relevant part, to negligent mistreatment and failure to provide necessary sustenance.

{20}    Under the standard established by the jury instructions, it was reasonable for the jury to find guilt. Dr. Norris testified that dogs A-7, A-8, B-3, B-6, B-7, B-9, B-10, B-13, B-25, B-34, B-37, and B-40 were significantly underweight or emaciated on April 1. Dr. Norris also testified that about thirty to forty bowls of dog food would be an appropriate amount to adequately feed the number of dogs Defendant kept; meanwhile, one of the officers testified that he did not see any food in bowls available to the dogs in the house. Based on the testimony by Dr. Norris about the dogs' emaciated condition and the amount of food necessary and on Defendant's testimony about the number of dogs and the length of time they were in her care, the jury could have reasonably concluded that Defendant failed to give the twelve dogs identified above the sustenance they needed, thereby satisfying the second prong of the jury instructions.

{21}    It furthermore would have been reasonable for the jury to conclude that Defendant also mistreated these and the other dogs identified in the indictment. First, Dr. Norris testified that it did not appear from her examination that the dogs were provided adequate care. The jury could have reasonably equated this inadequacy with mistreatment.

{22}    Second, there was evidence that the dogs were exposed to health hazards. Dr. Norris testified that dogs living in a feces-covered environment could develop skin and respiratory problems, and also that feces and urine contain ammonia, which can burn mucous membranes. Considering the testimony of other witnesses about the presence of feces and urine in the house, the jury could have reasonably inferred that the dogs were living in an unhealthy environment, a circumstance contributing to their mistreatment.

{23}    Third, there was evidence that the dogs' circumstances fostered their aggressive behaviors. Dr. Norris described the propensity of dogs, as pack animals, to become defensive and aggressive toward other dogs when their access to resources, including

---

[2]Defendant also testified that one of the dogs gave birth to seven puppies one week before April 1.

space, food, companionship, and water, is limited. Witnesses at trial testified to seeing little or no food or water available to the dogs. The jury also heard that Defendant kept the nearly fifty dogs together on her property. These observations could lead to a reasonable inference that the dogs' circumstances, which Defendant created, caused or aggravated their aggression toward each other. This inference is even stronger given Dr. Norris's testimony both that some of the dogs were not sterilized and that unsterilized female and male dogs should stay separated, because keeping them together would increase aggression among the males competing for the females.

**{24}**     Collectively, this evidence about the conditions the dogs were living in—conditions both consisting of inadequate access to food and water and also carrying the potential for health issues or injury by other, more aggressive dogs—could lead to the reasonable conclusion, beyond a reasonable doubt, that Defendant was unable to adequately meet the dogs' basic needs, and that such inadequacy amounted to mistreatment.

**{25}**     Overall, the State presented substantial evidence at trial to support the conclusion that Defendant mistreated the dogs, failed to give them necessary sustenance, or both. There was therefore sufficient evidence to support each of Defendant's animal cruelty convictions.

### III.     The District Court's Denial of an Instruction Defining Negligence as Criminal Negligence, if Error, Was Harmless

**{26}**     At the jury instruction stage of trial, the parties agreed on using instructions providing that, for each count of animal cruelty, Defendant was guilty if the jury found that she (1) "negligently mistreated, injured, killed without justification, or tormented [the particular dog associated with the count];" or that she (2) "abandoned or failed to provide necessary sustenance to [that dog.]" Of these two agreed-upon theories of liability presented to the jury, the first entailed a finding that Defendant acted with negligence, while the latter entailed a finding that Defendant deprived the particular dog of necessary food or water.

**{27}**     Regarding the first, defense counsel asked the district court to supplement the instruction with one patterned on UJI 14-133 NMRA, which defines negligence as "act[ing] with willful disregard of the rights or safety of others and in a manner which endanger[s] any person or property[.]" Defendant's proposed instruction defines a criminal standard of negligence.[3] *See State v. Yarborough*, 1996-NMSC-068, ¶ 20, 122 N.M. 596, 930 P.2d 131. The State objected to that instruction, after which the parties debated the matter, and the court ultimately declined to give the instruction. Defendant now argues that the ruling was error requiring reversal.

---

[3] Defendant's proposed instruction read, "For you to find that [D]efendant acted negligently, you must find that [D]efendant acted with willful disregard of the rights or safety of the dogs and in a manner which endangered the dogs."

**{28}** We review this issue, the denial of a requested jury instruction, de novo. *See State v. Salazar*, 1997-NMSC-044, ¶ 49, 123 N.M. 778, 945 P.2d 996. On review, we first consider whether the issue was preserved by a request for the instruction. *See State v. Benally*, 2001-NMSC-033, ¶ 12, 131 N.M. 258, 34 P.3d 1134. If it was, as here, then we review for reversible error. *See id.* Under this standard, we "seek to determine whether a reasonable juror would have been confused or misdirected by the jury instruction [given]." *Id.* (internal quotation marks and citation omitted). "[J]uror confusion or misdirection may stem . . . from instructions which, through omission or misstatement, fail to provide the juror with an accurate rendition of the relevant law." *Id.* At issue here is whether the omitted instruction defining "negligence" misdirected the jury by allowing it to find guilt under a standard lower than that required for an animal cruelty conviction, which we will assume without deciding is criminal negligence.

**{29}** Our case law does not squarely address whether the definition of criminal negligence, as expressed in UJI 14-133, must be given to the jury every time cruelty to animals, a misdemeanor, is charged and negligence is alleged as part of the charge. *Santillanes v. State*, 1993-NMSC-012, ¶ 13, 115 N.M. 215, 849 P.2d 358, and *Yarborough* make clear that when the Legislature has used but not defined "negligently" in a statute creating a felony, "only criminal negligence may be a predicate for [the] felony unless another intention is clearly expressed by the [L]egislature." *Yarborough*, 1996-NMSC-068, ¶ 18. This reasoning is based on the "intuitive notion that a higher standard than [civil] negligence should be applied when the crime is punishable as a felony." *Santillanes*, 1993-NMSC-012, ¶ 19. In line with that rationale, our Court has recognized that when a negligence-based crime is punished as a petty misdemeanor, a showing that meets the lower standard, civil negligence, suffices. *State v. Yarborough*, 1995-NMCA-116, ¶ 19, 120 N.M. 669, 905 P.2d 209, *aff'd*, 1996-NMSC-068; *accord Santillanes*, 1993-NMSC-012, ¶ 27. Notably, neither of New Mexico's appellate courts has established whether, generally speaking, negligence punished criminally at the misdemeanor level—i.e., the level between that of a petty misdemeanor and a felony—requires a showing of criminal or civil negligence.[4]

**{30}** We need not answer this question, however, to resolve this issue. This is because "[w]hen there can be no dispute that the essential element was established, . . . failure to instruct on that element does not require reversal of the conviction." *Santillanes*, 1993-NMSC-012, ¶ 32. More precisely, "[a] definitional instruction" such as that for criminal negligence "is not necessary if, as [a] matter of law, no rational juror could find that a defendant acted with less than criminal negligence." *State v. Reed*, 2005-NMSC-031, ¶ 57, 138 N.M. 365, 120 P.3d 447. Here—on those counts, if any, for which Defendant's guilt was premised on the first, "negligent" prong of the instruction—no rational juror could have found that she acted with less than criminal negligence.

---

[4] At least two cases indirectly touch on this point in the animal cruelty context. Both appear to assume without deciding that the appropriate standard is criminal negligence. *See State v. Collier*, 2013-NMSC-015, ¶ 25, 301 P.3d 370 (remarking, for purposes of issue preclusion and double jeopardy, that the state would have to prove criminal negligence for an animal cruelty charge); *State v. Duttle*, 2017-NMCA-001, ¶ 18, 387 P.3d 885 (noting, in weighing the sufficiency of the evidence for animal cruelty convictions, the absence of a "criminal negligence" definition in the jury instructions).

**{31}** Turning to the central issue of whether omitting the instruction defining "negligence" allowed the jury to find guilt under a standard lower than criminal negligence, we conclude for the following reasons that it did not. To begin, this Court has recognized a relationship, relevant here, between criminal negligence and general criminal intent in the animal cruelty context. *State v. Stewart* held that a defendant's intentional, purposeful, or deliberate act of harming an animal "is sufficient to establish that the defendant acted with 'willful disregard' for that animal's safety"—that is, sufficient to establish criminal negligence. 2005-NMCA-126, ¶ 32, 138 N.M. 500, 122 P.3d 1269. The defendant in *Stewart* was convicted of animal cruelty for having kicked a puppy. *Id.* ¶ 1. He conceded that he acted intentionally when he committed that act. *Id.* ¶ 31. His argument on appeal was that "when the evidence shows intentional conduct, a conviction for criminally negligent conduct cannot stand." *Id.* The court rejected that argument and upheld the conviction, reasoning that the defendant's conduct both sufficed to establish criminal negligence and also established more culpability than required for negligent animal cruelty. *Id.* ¶ 33.

**{32}** Although the defendant in *Stewart*, unlike Defendant here, conceded that "it [was] his conscious object to injure an animal," *id.*—in other words, that he intended harm to the puppy—the *Stewart* principle extends to this case. The jury here found that Defendant "acted intentionally when [s]he committed the crime"—that is, acted with general criminal intent. In both cases, then, the defendants intended to commit an act. The acts in question constituted harm to one or more animals. Thus, in both *Stewart* and here, there are intentional acts constituting proscribed conduct. This is in contrast to those cases in which the defendant's intentional, negligent act creates a risk of harm, and actual harm results; only then—in that type of case—is the presence of the risk or fault associated with criminal negligence called into question.[5] *See, e.g., State v. Magby*, 1998-NMSC-042, ¶¶ 1-2, 15, 126 N.M. 361, 969 P.2d 965 (analyzing the level of negligence necessary to support a conviction of child abuse arising from an accident in which a child fell from a horse, allegedly because of the defendant's actions), *overruled on other grounds by State v. Mascareñas*, 2000-NMSC-017, ¶ 27, 129 N.M. 230, 4 P.3d 1221; *cf. Santillanes*, 1993-NMSC-012, ¶ 38 ("The purpose of the criminal negligence standard is to deter behavior that is culpable or, in other words, *conduct that entails greater risk or fault* than mere inadvertence or simple negligence." (emphasis added)).

**{33}** Here, as in *Stewart*, the question of criminal negligence does not come into play, given the jury's general intent finding and the evidence presented at trial. The jury found that Defendant acted intentionally while engaging in conduct that did more than simply create the risk of, and end in, harm; the conduct itself constituted animal cruelty. In reaching its conclusion in this regard, the jury therefore necessarily found that Defendant acted with a willful disregard of the dogs' safety and in a manner that

---

[5] This was not a situation in which, for example, a careless driver accidentally kills an animal that darts in front of the driver's car. In such a scenario, a jury would properly consider whether the defendant's conduct leading to the accident deviated (grossly, in the case of criminal negligence) from the standard of care that a reasonable person would exercise in the defendant's situation—or, said differently, whether the defendant's careless conduct was negligent.

endangered them—that she acted at a standard meeting or exceeding criminal negligence. *See Stewart*, 2005-NMCA-126, ¶ 32. To briefly reiterate aspects of the volume of evidence supporting the jury's determination: a team of law enforcement and animal control officers encountered dozens of dogs in a feces-laden environment and lacking sufficient food and water. Some were caged, others appeared wounded or disabled, and aggressive behavior among the many dogs was persistent.

**{34}** Accordingly, the district court's denial of Defendant's request for the instruction defining negligence—if error—was harmless error not warranting the reversal of Defendant's animal cruelty convictions. To the extent that the convictions were based on the first, negligence-based prong of the jury instruction, no rational juror could have found that Defendant acted with less than criminal negligence.

## IV.    Defendant's "Void-For-Vagueness" Claim Is Unreviewable

**{35}** Defendant argues next that the unlicensed practice of veterinary medicine statute, Section 61-14-18, is "unconstitutionally vague" and thus a violation of due process. Although Defendant characterizes the issue in this manner, the underpinnings of her argument are at odds with her assertion and otherwise do not undermine her conviction. This is evident in light of the vagueness doctrine, the statute's text, and the actual charge against Defendant.

**{36}** The vagueness doctrine, insofar as it relates to what Defendant appears to be arguing, "is based on the principle of fair notice in that no one may be held criminally responsible and subject to criminal sanctions for conduct without fair warning as to the nature of the proscribed activity." *Duttle*, 2017-NMCA-001, ¶ 12 (internal quotation marks and citation omitted).

**{37}** The veterinary medicine statute provides that it is a misdemeanor for a person to practice veterinary medicine without a licence entitling them to engage in that practice. Section 61-14-18. The practice is defined in relevant part as

> the diagnosis, treatment, correction, change, relief or prevention of animal disease, deformity, defect, injury or other physical or mental condition, including the prescription or administration of any drug, medicine, biologic, apparatus, application, anesthetic or other therapeutic or diagnostic substance or technique and the use of any procedure for artificial insemination, testing for pregnancy, diagnosing and treating sterility or infertility or rendering advice with regard to any of these[.]

NMSA 1978, § 61-14-2(B)(1) (1993, amended 2017).

**{38}** The thrust of Defendant's argument is not that the statute's vagueness prevented her from knowing that her conduct violated it, which would more closely resemble a vagueness claim. *See Santillanes*, 1993-NMSC-012, ¶ 22 (concluding that the vagueness doctrine is implicated when "persons of common intelligence must guess at

the meaning of an element in a criminal statute and thereby differ as to its application"). She instead argues that she (and, by implication, other dog owners) should be exempted from the statute because otherwise, "no pet owner would be permitted to give their pets medication or clean a fresh wound," "diagnose[] their dog as having diarrhea," or give "in-home care [to] a personal pet," including by administering flea medication.

**{39}** These claims are irrelevant here. In essence, Defendant is putting forth a broad interpretation of the statute, treating it as valid, and concluding that absurd results would follow from that interpretation. But this case does not call for resolution of the issue Defendant raises. Underlying Defendant's charge was not, to use her example, the simple cleaning of a dog's wound. Rather, the State's theory was that she was spaying and neutering dogs and giving them rabies shots without a valid license. Defendant does not challenge the statute as unconstitutional when applied to those facts.

**{40}** Instead of a vagueness challenge, Defendant presents a hypothetical issue, the resolution of which would have no effect on her case. In accordance with our practice, we will not review the issue. *See State v. Ordunez*, 2012-NMSC-024, ¶ 22, 283 P.3d 282.

## V.     Defendant's Limitation-of-Testimony Challenge Is Unreviewable

**{41}** Defendant next contends that "[t]he [district c]ourt's limitation of testimony, both in [her] case-in-chief and on cross-examination of the State's expert, was an abuse of discretion warranting reversal." Defendant argues that the court improperly restricted her testimony about the dogs to only the kind made by a layperson, not an expert, since Defendant had not been offered and accepted as an expert witness. Defendant further contends that she was prevented from eliciting certain information from the State's expert witness during cross-examination.

**{42}** Defendant's briefing is inadequate for us to properly review this issue. For one thing, Defendant omits a statement on preservation, in violation of Rule 12-318(A)(4) NMRA. Our ability to know whether this issue is reviewable—and if so, to apply the correct standard of review—is thus impaired. *See, e.g.*, Rule 12-321(A) NMRA ("To preserve an issue for review, it must appear that a ruling or decision by the [district] court was fairly invoked."); Rule 12-321(B)(2) (dictating the scope of review for unpreserved arguments). Even if these preliminary requirements had been met, however, Defendant still fails to establish that the district court's limiting of testimony warrants reversal, as she asserts it does.

**{43}** Concerning Defendant's first argument, regarding the limitation on her own testimony, her only citation to authority in support of the substance of her claim is *Chambers v. Mississippi*, 410 U.S. 284 (1972). She characterizes *Chambers* as standing for the proposition that "state evidence rules . . . that prevent admission of evidence must fall if they interfere with a criminal defendant's right to present a defense."

**{44}** Even if we accept Defendant's characterization, she has failed to establish how the district court's ruling impaired her defense. In its answer brief, the State points out that Defendant was in fact allowed to testify on the matters she claims she could not: the condition of one of the dogs when she got it and her care for the dogs, generally. The State further argues that Defendant "fails to . . . otherwise substantiate her claim with any analysis." Defendant did not respond to clarify her assertions.

**{45}** Overall, Defendant gives us too little material showing that her defense was impaired for *Chambers* to come to her aid. In the absence of any other legal authority or argument establishing that the district court's ruling amounted to error, we recognize none. *See, e.g.*, Rule 12-318(A)(4) (requiring citation to New Mexico decisions); *State v. Vigil-Giron*, 2014-NMCA-069, ¶ 60, 327 P.3d 1129 (assuming that no authority supporting a proposition exists when the party asserting it cites none).

**{46}** Concerning Defendant's second complaint, regarding the limitation of her cross-examination of State's expert witness, Defendant contends that she "was prohibited from asking [the expert, Dr. Norris,] about the dogs' health records while in the [animal shelter], in violation of [Defendant's federal constitutional rights] to due process, fair trial, and confrontation." Defendant cites two points in the trial record in reference to this claim.[6] Only one is relevant.[7] It documents a bench conference in which the district court appeared to agree with the State that Dr. Norris could not answer a question about the dogs' animal-shelter weights because, as had already been established, she lacked that information. Here, too, the State makes this point in its answer brief, and Defendant fails to rebut it or cite any authority supporting her claim of error.

**{47}** All considered, Defendant fails to adequately develop this argument and has therefore failed to meet her burden to demonstrate error. *See State v. Aragon*, 1999-NMCA-060, ¶ 10, 127 N.M. 393, 981 P.2d 1211.

## VI. Defendant's Competency Claim Is Unreviewable

**{48}** Defendant next argues that the district court erred by finding Defendant competent to stand trial because that finding was contrary to the conclusion of the only expert witness to testify at Defendant's competency hearing. Defendant contends that, "[i]n light of the lack of contrary evidence [presented at the hearing] to [the expert's] opinion, it was an abuse of discretion to find [Defendant] competent." She continues, "given no evidence to the contrary, there was only one correct outcome, and the [district c]ourt ignored it."

---

[6]We rely on Defendant for citations to the record, since it is not our duty to "search the record to find facts to support [a defendant's] argument." *State v. Dominguez*, 2014-NMCA-064, ¶ 26, 327 P.3d 1092. We also consider Defendant's argument only insofar as the citations she provides direct us to the error she alleges. *See, e.g.*, *Murken v. Solv-Ex Corp.*, 2005-NMCA-137, ¶ 14, 138 N.M. 653, 124 P.3d 1192.

[7]The other citation is to a point at trial when Defendant, not Dr. Norris, is testifying.

**{49}** The record tells a different story. It reveals that the district court relied on statements reported by the expert and that it then applied the expert's findings to a set of legal factors for determining competency. The court found that Defendant met the factors and therefore was competent to stand trial under the law.

**{50}** On appeal, Defendant does not argue that the district court relied on legally incorrect factors or misapplied the facts to the law in making its determination. Nor does Defendant cite any authority for the proposition that a district court must, when there is only one expert, adopt the ultimate conclusion of that expert. Defendant instead makes the bare assertions quoted above and fails to cite to any authority that gives her claim merit. In light of these deficiencies, we will not review this issue. *See* Rule 12-318(A)(4) (requiring citation to authority in appellate briefs); *State v. Nozie*, 2009-NMSC-018, ¶ 15, 146 N.M. 142, 207 P.3d 1119 ("[A]n appellate court is not required to review issues raised in appellate briefs that are unsupported by cited authority. When a criminal conviction is being challenged, counsel should properly present the reviewing court with the issues, arguments, and proper authority. Mere reference in a conclusory statement will not suffice and is in violation of our rules of appellate procedure." (alteration, internal quotation marks, and citation omitted)).

## VII. We Decline to Review Defendant's Ineffective Assistance of Counsel Claim

**{51}** Defendant's last substantive issue concerns the assistance of her trial counsel. Defendant argues that she was denied effective assistance "because [her trial counsel] was not granted continuances to prepare and hire expert witnesses to counter the State's expert witness." We agree with the State that Defendant fails to make a prima facie showing that she was denied the effective assistance of counsel. Despite recognizing that the standard for ineffective assistance is met when "counsel's performance [falls] below an objective standard of reasonableness," *see, e.g.*, *State v. Sloan*, 2019-NMSC-019, ¶ 33, 453 P.3d 401, Defendant fails to point to any deficiency in her counsel's performance.

**{52}** Defendant instead focuses on the district court's refusal to grant continuances. Here, too, the record contradicts Defendant's assertions: it shows that the court granted the first six of Defendant's eight requests for a continuance. More to the point, however, Defendant fails to establish the relationship between the court's refusal to grant a seventh continuance and her trial counsel's deficient performance, and she also fails to cite to any authority lending merit to her claim. We therefore decline to review this issue. *See Nozie*, 2009-NMSC-018, ¶ 15.

## VIII. Defendant's Trial Was Free of Cumulative Error

**{53}** Defendant lastly contends that the errors alleged on appeal constitute cumulative error requiring a reversal of the judgment. Having identified no error at trial, we recognize no cumulative error. *See State v. Samora*, 2013-NMSC-038, ¶ 28, 307 P.3d 328.

**CONCLUSION**

**{54}** We affirm.

**{55} IT IS SO ORDERED.**

**KRISTINA BOGARDUS, Judge**

**I CONCUR:**

**J. MILES HANISEE, Chief Judge**

**IVES, Judge (dissenting in part and concurring in part).**

**{56}** Defendant was exposed to the possibility of spending over two decades in prison for twenty-two animal cruelty convictions that were based on a legally erroneous instruction on an essential element at the heart of Defendant's trial. The improper instruction allowed the jury to find Defendant guilty if it concluded that her treatment of the dogs was unreasonable or careless. But the law requires the State to meet a significantly higher standard: criminal negligence, which entails willful disregard for the safety of the dogs and endangerment. By refusing to give Defendant's requested criminal negligence instruction, the district court allowed the State to obtain convictions based on a legally invalid ordinary negligence theory and effectively prevented Defendant from presenting the legally valid defense that she was not aware of any significant risk of harm to the dogs. In my view, this prejudicial error requires reversal of Defendant's animal cruelty convictions and a new trial on those charges. Because the majority concludes otherwise, I respectfully dissent.[8]

**I.  The Animal Cruelty Statute Requires the State to Prove Criminal Negligence**

**{57}** Whether New Mexico's animal cruelty statute requires the State to prove ordinary negligence or criminal negligence is a question of statutory construction that we review de novo. *See State v. Nick R.*, 2009-NMSC-050, ¶ 11, 147 N.M. 182, 218 P.3d 868. I therefore "begin with the plain language of the statute, which is the primary indicator of legislative intent." *State v. Suazo*, 2017-NMSC-011, ¶ 16, 390 P.3d 674 (alteration, internal quotation marks, and citation omitted). Section 30-18-1(B) provides, in pertinent part, that "[c]ruelty to animals consists of a person . . . *negligently* mistreating, injuring, killing without lawful justification or tormenting an animal[.]" (Emphasis added.) A person who commits this crime "is guilty of a misdemeanor," but "[u]pon a fourth or subsequent conviction," the person "is guilty of a fourth degree felony." Section 30-18-1(D).

---

[8] I concur in the majority's affirmance of Defendant's conviction for practicing veterinary medicine without a license.

**{58}**    That animal cruelty may be punished as a felony is critical because it is "well-established in New Mexico[] that only criminal negligence may be a predicate for a felony unless another intention is clearly expressed by the [L]egislature." *Yarborough*, 1996-NMSC-068, ¶ 18; *see also Santillanes*, 1993-NMSC-012, ¶ 30 ("When a crime is punishable as a felony, civil negligence ordinarily is an inappropriate predicate by which to define such criminal conduct."). Therefore, in interpreting the statutory mens rea element of "negligen[ce]," we must presume that the Legislature was aware of New Mexico precedent that existed in 1999, when the Legislature enacted the animal cruelty statute. *See V.P. Clarence Co. v. Colgate*, 1993-NMSC-022, ¶ 10, 115 N.M. 471, 853 P.2d 722 ("[T]he [L]egislature is presumed to act with knowledge of relevant case law[.]"). At that time, our Supreme Court had already recognized, in *Santillanes* and *Yarborough*, that felony offenses require proof of criminal negligence absent a clear expression of legislative expression to the contrary. Presumably aware of these precedents, the Legislature did not elect to clearly express its intention to allow a felony animal cruelty conviction based on a finding of ordinary negligence. I therefore conclude that the requisite intent for felony animal cruelty is criminal negligence.

**{59}**    And because the Legislature chose to define the essential elements of felony and misdemeanor animal cruelty identically, the mens rea for the misdemeanor must also be criminal negligence. The plain language and structure of the statute compel that conclusion. *See State v. Almanzar*, 2014-NMSC-001, ¶ 15, 316 P.3d 183 (recognizing that "[i]f the relevant statutory language is unclear, ambiguous, or reasonably subject to multiple interpretations," a court should proceed to consider "the history, background, and overall structure of the statute, as well as its function within a comprehensive legislative scheme" (internal quotation marks and citations omitted)). The Legislature chose to use exactly the same words to define the essential elements of the felony and the misdemeanor. Both the felony and the misdemeanor are defined in the same subsection of the statute, and the Legislature used the word "negligently" to describe the intent element. I do not believe we should assign different definitions to the same word appearing in the same subsection of the same statute. *See State v. Cleve*, 1999-NMSC-017, ¶ 12, 127 N.M. 240, 980 P.2d 23 (concluding that the Legislature intended for the phrase "any animal" to have the same meaning "within a single subsection" of the animal cruelty statute). Assigning two different meanings to the word "negligently" under these circumstances would create a contradiction. *See Nick R.*, 2009-NMSC-050, ¶ 11 (recognizing that we must avoid construing statutes in a manner that would lead to a contradiction). Had the Legislature intended to require criminal negligence for the felony and ordinary negligence for the misdemeanor, it could easily have said so. But the Legislature chose instead to describe the mental states for both crimes with a single word, "negligently." Under these circumstances, to hold that criminal negligence is required for the felony but that ordinary negligence is required for the misdemeanor would require us to rewrite the statute. I decline to do so, adhering instead to the words and structure the Legislature chose. *See Martinez v. Sedillo*, 2005-NMCA-029, ¶ 7, 137 N.M. 103, 107 P.3d 543 ("We will not rewrite a statute."). I would therefore hold that a defendant may not be convicted of misdemeanor animal cruelty absent proof beyond a reasonable doubt that the defendant acted with criminal negligence.

## II.    The District Court Erred by Refusing to Give a Criminal Negligence Instruction

**{60}**    I agree with Defendant that the district court erred by refusing to give the jury the following instruction: "For you to find that [D]efendant acted negligently, you must find that [D]efendant acted with willful disregard of the rights or safety of the dogs and in a manner which endangered the dogs."[9] Defendant's requested instruction closely tracks New Mexico's uniform jury instruction defining "criminal negligence," UJI 14-133.[10] By refusing to instruct the jury that the State bore the burden of proving that Defendant was *criminally* negligent, as that mental state is defined by UJI 14-133 and our precedent, the district court left the jury with the incorrect impression that it could convict Defendant for being merely "negligent," as that word is defined in lay dictionaries. *See Magby*, 1998-NMSC-042, ¶ 13 (recognizing that "[a]bsent express definition of a term in an instruction, words in jury instructions should usually be understood according to their ordinary meaning[,]" which may be found in "[l]ay dictionaries"). In ordinary usage (and under our civil law), "negligent" means "failure to exercise the care that a reasonably prudent person would exercise in like circumstances." *Negligence*, *Merriam-Webster*, https://www.merriam-webster.com/dictionary/negligence (last visited Mar. 9, 2020).

**{61}**    But New Mexico law sets a significantly higher standard for criminal negligence. Our Supreme Court has equated criminal negligence and recklessness. *See Mascareñas*, 2000-NMSC-017, ¶ 9 ("Criminal negligence has been defined as including conduct which is reckless, wanton, or willful." (internal quotation marks and citation omitted)). "Typical definitions of recklessness require an actor to *consciously disregard* a substantial and unjustifiable risk of such a nature and degree that its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation." *State v. Consaul*, 2014-NMSC-030, ¶ 37, 332 P.3d 850 (emphasis added) (citing definition of "recklessly" in Model Penal Code § 2.02(2)(c) (Official Draft 1962)).[11] When criminal negligence is an essential element, our Supreme

---

[9] Defendant's requested instruction pertained only to the portion of the essential elements instruction that was based on the State's negligence theory. That instruction also included the State's alternative theory that Defendant failed to provide necessary sustenance to the dogs. However, the alternative theory does not give us a basis to affirm because the jury returned a general verdict, not a special verdict, which makes it impossible for us to determine whether the jury relied on negligence, failure to provide necessary sustenance, or both. *See Campos v. Bravo*, 2007-NMSC-021, ¶ 19, 141 N.M. 801, 161 P.3d 846 (recognizing that when a jury is instructed on alternative theories—one legally adequate and the other inadequate—and returns a general verdict, reversal is required because the appellate court cannot determine which theory the jury relied on).

[10] Defendant properly modified the uniform instruction to clarify that the case involved dogs. UJI 14-133 defines criminal negligence as "willful disregard of the rights or safety of others and in a manner which endangered any person or property[,]" but Use Note 4 allows modification "[i]f the statutory offense identifies some injury other than to a person or the property of others[.]"

[11] *Consaul* resolved confusion about whether criminal negligence entails subjective knowledge. In *State v. Webb*, which preceded *Consaul*, this Court recited an objective standard for child abuse, explaining that "a defendant need not be subjectively aware of a risk, but the risk must be one of which he should be aware." 2013-NMCA-027, ¶ 22, 296 P.3d 1247 (internal quotation marks and citation omitted); *see also State v. Muraida*, 2014-NMCA-060, ¶ 10, 326 P.3d 1113 (applying this principle from *Webb* in the elder abuse context). This statement in *Webb* was

Court has mandated the use of UJI 14-133, which requires the state to prove that "the defendant acted with [(1)] willful disregard of the rights or safety of others and [(2)] in a manner which endangered any person or property." Under UJI 14-133, the state must prove that the defendant was "aware of the risk caused by his or her conduct and continued to act." *State v. Henley*, 2010-NMSC-039, ¶ 16, 148 N.M. 359, 237 P.3d 103. In other words, a defendant must "possess *subjective knowledge* 'of the danger or risk to others posed by his or her actions.' " *State v. Skippings*, 2011-NMSC-021, ¶ 18, 150 N.M. 216, 258 P.3d 1008 (emphasis added) (quoting *Henley*, 2010-NMSC-039, ¶ 17).

**{62}** Because of the significant difference between the ordinary definition of negligence and New Mexico's legal definition of criminal negligence, the instructions the jury received in Defendant's case would have confused and misled a reasonable juror. *See State v. Luna*, 2018-NMCA-025, ¶ 22, ___ P.3d ___ ("[F]ailure to give a definitional instruction when the term being defined has a legal meaning different from the commonly understood lay interpretation of the term may result in jury confusion that could place the verdict in doubt." (alteration, internal quotation marks, and citation omitted)). Without the benefit of Defendant's requested instruction defining criminal negligence, the jury was left with the mistaken understanding that it could convict Defendant of animal cruelty if the State proved that she failed to exercise the care expected of a reasonably prudent person in like circumstances. But a person can behave unreasonably without disregarding—or even possessing a subjective awareness of —a substantial and unjustifiable risk of harm. The erroneous instruction decreased the State's burden, allowing it to obtain convictions without proving that Defendant had the requisite mens rea. Viewing the evidence and arguments through the prism of ordinary negligence, rather than criminal negligence, the jury had a highly distorted view of its task. Because the instructions "direct[ed] the jury to find guilt based on a misstatement of the law, a finding of juror misdirection is unavoidable." *State v. Dowling*, 2011-NMSC-016, ¶ 17, 150 N.M. 110, 257 P.3d 930.

### III.    Reversal Is Required

**{63}** The prejudice caused by this error requires reversal under the "less onerous level of scrutiny" we apply in reviewing jury instructions for reversible error. *State v. Cunningham*, 2000-NMSC-009, ¶ 21, 128 N.M. 711, 998 P.2d 176. The erroneous instruction rendered key components of Defendant's testimony irrelevant. Defendant explained to the jury that she believed she was providing adequate food, water, exercise, and medication for the dogs and that her techniques for caring for the dogs were effective. Under the criminal negligence instruction that the law required, Defendant's testimony about her subjective beliefs would have been not only relevant, but potentially exculpatory. A properly instructed juror who credited Defendant's testimony that she believed the dogs were reasonably safe and well looked-after in her care could have concluded that she did not willfully disregard their safety. *Cf. Mascareñas*, 2000-NMSC-017, ¶ 15 ("If the jury believed . . . [that the defendant] did not know that shaking [the infant victim] could cause the injuries associated with SBS and

---

based on *State v. Schoonmaker*, 2008-NMSC-010, ¶ 44, 143 N.M. 373, 176 P.3d 1105, which our Supreme Court overruled in *Consaul*. Accordingly, I read *Consaul* as implicitly overruling *Webb* and *Muraida* on this point.

that he shook the [victim] only 'hard once,' it is possible that the jury could have, with an instruction properly defining criminal negligence, attributed his conduct to mere carelessness and not reckless disregard of [the victim's] safety and health."). In contrast, Defendant's subjective beliefs were wholly irrelevant under the faulty instructions, which asked the jury only whether Defendant behaved as a reasonable person would have.

**{64}** The erroneous instructions also skewed the jury's evaluation of the extent to which Defendant had mistreated or injured the dogs, a question inextricably linked with the issue of intent, *see Nozie*, 2009-NMSC-018, ¶ 32 ("[B]ecause an individual's intent is seldom subject to proof by direct evidence, intent may be proved by circumstantial evidence." (alteration, internal quotation marks, and citation omitted)). The parties offered conflicting accounts of the conditions the dogs were subjected to while in Defendant's care, and the testimony of the State's witnesses painted a significantly grimmer picture of the dogs' physical condition and living environment than did Defendant's testimony about how she cared for, fed, cleaned up after, and exercised the dogs. The jury instructions should have required the jury to at least consider these conflicts in determining whether Defendant's actions rose to the level of criminal negligence. Defendant's account may well have persuaded the jury that she did not act with criminal negligence, but it was far less likely that the jury would see her testimony as exculpatory when viewing it through a civil negligence prism.

**{65}** And the State's arguments ensured that the jury viewed the entire case through that prism. The State successfully opposed Defendant's request for a criminal negligence instruction, arguing that the crime of cruelty to animals by negligent mistreatment requires only a showing of civil negligence. After persuading the district court to adopt that position, the State (understandably) made full use of its victory by repeatedly characterizing Defendant's conduct as "negligent mistreatment" during closing argument. And the State made clear that it was referring to negligence in the ordinary sense, arguing that "no reasonable person" would say that the environment Defendant provided was adequate for the dogs. The State's argument matched the erroneous instruction the jury received, and the absence of an instruction explaining the concept of criminal negligence made it impossible for defense counsel to rebut that argument. The defense had no basis in the instructions to argue that the State's theory was legally flawed. *Cf. State v. Gonzalez*, 2005-NMCA-031, ¶ 25, 137 N.M. 107, 107 P.3d 547 ("[I]nasmuch as the jury was not instructed on the element of knowledge, we would not expect [the d]efendant's argument to focus on that element.").

**{66}** In concluding that the instructional error was harmless, the majority relies on the jury's finding that Defendant acted "intentionally" within the meaning of our uniform general intent instruction, UJI 14-141 NMRA. In my view, that reliance is misplaced. As an initial matter, we have no way of knowing whether the jury understood the general intent instruction given in this case to apply to the elements of animal cruelty through negligent mistreatment. The district court did not comply with UJI 14-141, which required the court to "identify [the] crime or crimes" that the instruction applied to.

Instead, the court issued an instruction, based on the *template* for UJI 14-141, that provided:

> *In addition to the other elements of* [*sic*] the [S]tate must prove to your satisfaction beyond a reasonable doubt that [D]efendant acted intentionally when he committed the crime. A person acts intentionally when he purposely does an act which the law declares to be a crime, even though he may not know that his act is unlawful. Whether . . . Defendant acted intentionally may be inferred from all of the surrounding circumstances, such as the manner in which he acts, the means used, and his conduct and any statements made by him.

(Emphasis added.) On its face, this instruction did not inform the jury that it applied to the crime of cruelty to animals, and no other instruction informed the jury that it could only find Defendant guilty under a negligent mistreatment theory if it found that Defendant "acted intentionally" by "purposely do[ing] an act that the law declares to be a crime."

**{67}**    The district court instructed the jury on the elements of both practicing veterinary medicine without a license and animal cruelty, and the elements instructions for all twenty-two of the cruelty to animals charges provided that the jury could convict either under a negligent mistreatment theory or on a finding that Defendant had abandoned or failed to provide necessary sustenance to the dogs. Without speculating, we cannot say whether the jury would have understood the grammatically improper and legally erroneous phrase "elements of" to apply to the crime of cruelty to animals by negligent mistreatment, to the alternative theory of abandonment or failure to provide necessary sustenance, or to the very different charge of practicing veterinary medicine without a license. The majority provides no explanation for its apparent conclusion that a rational juror would necessarily have concluded that the instruction applied to the elements of negligent mistreatment, and I can think of none. I cannot say with the degree of confidence necessary for this Court to affirm a criminal conviction that the jury understood this ambiguous instruction to apply to the elements of animal cruelty by negligent mistreatment. For that reason alone, I would decline to rely on the instruction.

**{68}**    Even assuming that the jury understood the instruction to apply to the charges of cruelty to animals by negligent mistreatment, I cannot agree that the jury's finding of general intent negates the prejudice arising from the district court's refusal to instruct the jury on the element of criminal negligence. By defining "act[ing] intentionally" as "purposely do[ing] an act," UJI 14-141, as I read it, requires juries to find only that a defendant has committed a crime through his or her voluntary actions.[12] A substantial

---

[12] One way of framing the question is whether the defendant had the mental state necessary for his or her actions to qualify as the actus reus of a crime. *See* 1 Wayne R. LaFave, *Substantive Criminal Law* § 5.2(e), at 475 (3d ed. 2018) ("[W]here the definition of a crime requires some forbidden act by the defendant, his bodily movement, *to qualify as an act*, must be voluntary. To some extent, then, all crimes of affirmative action require something in the way of a mental element—at least an intention to make the bodily movement which constitutes the act which the crime requires." (emphasis added)).

volume of New Mexico authority supports that or a similar interpretation. *See, e.g.*, *State v. Ramos*, 2013-NMSC-031, ¶ 28, 305 P.3d 921 ("[G]eneral intent is only the intention to make the bodily movement which constitutes the act which the crime requires." (quoting Wayne R. LaFave, *Substantive Criminal Law* § 5.2(e), at 355 (2d ed. 2003))); *State v. Hargrove*, 1989-NMSC-012, ¶ 10, 108 N.M. 233, 771 P.2d 166 (equating a finding of general criminal intent to a finding that the crime charged was committed through "the free act of the one being tried" (quoting *State v. Hittson*, 1953-NMSC-018, ¶ 10, 57 N.M. 100, 254 P.2d 1063)); *State v. Contreras*, 2007-NMCA-119, ¶ 16, 142 N.M. 518, 167 P.3d 966; *Gonzalez*, 2005-NMCA-031, ¶ 23; *State v. Elliott*, 2001-NMCA-108, ¶ 61, 131 N.M. 390, 37 P.3d 107 (Sutin, J., dissenting) ("[UJI 14-141] requires only an intent to do an act, where the doing of the act ends up causing harm, even if there is no specific intent to cause harm."); *see also State v. Gee*, 2004-NMCA-042, ¶ 15, 135 N.M. 408, 89 P.3d 80 (rejecting the defendants' contention that the district court had committed fundamental error in giving UJI 14-141 in addition to elements instructions that set out the specific intent elements for larceny and forgery because no reasonable juror would have convicted "based only on a purposeful act").

**{69}**    Under my reading of the instruction, any jury finding that Defendant "acted intentionally" is nothing more than a finding that Defendant mistreated the dogs through her own purposeful acts. That finding sheds no light on whether the jury found that Defendant mistreated the dogs with the requisite culpability. A person can intentionally do acts that constitute mistreatment without "willful[ly] disregard[ing] . . . the rights or safety of others," let alone intending to mistreat. *Cf. Schoonmaker*, 2008-NMSC-010, ¶ 48 (reasoning that "a person could intend to violently shake a baby without a subjective awareness of the risk of harm or with[out] indifference to that risk"), *holding abrogated by State v. Montoya*, 2015-NMSC-010, ¶ 38, 345 P.3d 1056 (holding that reckless child abuse resulting in the death of a child under twelve is a lesser-included offense of intentional child abuse resulting in the death of a child under twelve), *and overruled on other grounds by Consaul*, 2014-NMSC-030, ¶ 48; *State v. Ibn Omar-Muhammad*, 1985-NMSC-006, ¶ 22, 102 N.M. 274, 694 P.2d 922 (stating that the concept of "purposefully engag[ing] in an unlawful act . . . does not require that a defendant know of any risk involved in his actions"). In this case, it is clear—undisputed, even—that Defendant intentionally performed the actions that the jury found constituted mistreatment. What is not at all clear, however, is whether the jury found that, in performing those actions, Defendant subjectively appreciated that she was exposing the dogs to a substantial and unjustifiable risk of harm. Because the jury was erroneously instructed on a civil negligence standard, I understand the jury to have found that Defendant mistreated the dogs through intentional acts that were objectively unreasonable, a finding that cannot support Defendant's convictions.

**{70}**    Although I believe the majority understands the general intent instruction much as I do, that understanding compels me to reach a different conclusion than that reached by the majority. The majority interprets the jury's finding under the instruction to be a finding that Defendant "intended to commit an act"; committed "intentional acts constituting proscribed conduct"; or committed "intentional, negligent act[s]." Majority Op. ¶ 32. The majority concludes, however, that this finding renders the error in the

instruction harmless because the acts that Defendant intentionally performed themselves "constituted animal cruelty" and "the jury therefore necessarily found that Defendant . . . acted at a standard meeting or exceeding criminal negligence." *Id.* ¶ 33. I cannot subscribe to this analysis, which I believe to be inconsistent with the plain language of our cruelty to animals statute. In my view, because the statute prohibits "*negligently* mistreating, injuring, killing without lawful justification or tormenting an animal," Defendant's *acts* cannot in and of themselves "constitute[] animal cruelty" or "proscribed conduct." *See id.* ¶¶ 32-33. Although the jury could certainly have used those acts as circumstantial evidence of the mental state Defendant possessed at the time she mistreated or injured the dogs, the acts do not in and of themselves establish Defendant's intent. And because the element of intent was a disputed issue in this case, there is at least "a distinct possibility," *Magby*, 1998-NMSC-042, ¶ 15, that the jury convicted Defendant without considering whether she had acted with criminal negligence upon finding that Defendant's actions demonstrated that she had unreasonably mistreated or injured the dogs.

**{71}** *State v. Stewart*, 2005-NMCA-126, does not support the majority's analysis. The defendant in *Stewart* was convicted of cruelty to animals by negligent mistreatment on the basis of evidence showing that he had intentionally kicked a puppy. *Id.* ¶ 1. On appeal, he contended that his conviction for cruelty to animals by negligent mistreatment was supported by insufficient evidence because the evidence showed that he had intentionally mistreated the puppy, a crime that he argued was punishable only as extreme cruelty to animals under Section 30-18-1(E). *Stewart*, 2005-NMCA-126, ¶ 28.[13] We disagreed, concluding that evidence sufficient to prove the mens rea element "intentionally" of extreme cruelty to animals, § 30-18-1(E), is necessarily sufficient to prove the mens rea element of negligence—which the Court presumed was criminal negligence—applicable to the basic crime of cruelty to animals, § 30-18-1(B). *Stewart*, 2005-NMCA-126, ¶ 32. We reasoned that the statutory element "intentionally" meant "purposely," relying for some reason on the general intent instruction and the instruction on the element "intentional" then applicable in the child abuse context to equate the two words. *Id.* ¶ 32 (citing UJI 14-141 and UJI 14-610 NMRA (2005)). Having concluded that "intentionally" meant "purposely," we looked for guidance in the Model Penal Code, which provides that "[w]hen recklessness suffices to establish an element, such element also is established if a person acts purposely or knowingly." Model Penal Code § 2.02(5); *Stewart*, 2005-NMCA-126, ¶ 33. And, for the final step in our analysis, we implicitly reasoned that the element "intentionally" of the extreme cruelty subsection described the same mental state as the culpability element "purposely" under the Model Penal Code: a "conscious object" to engage in a particular type of conduct or cause a particular result. *See* Model Penal Code § 2.02(2)(a)(i) ("A person acts purposely with

---

[13] *Compare Stewart*, 2005-NMCA-126, ¶ 28 (reciting the defendant's argument), *and Schoonmaker*, 2008-NMSC-010, ¶ 46 n.4 ("[O]ne cannot commit an intentional act and an unintentional but substantially risky act at the same time, even though the act is voluntary as to both and the evidence may be sufficient to charge both offenses as alternative theories." (internal quotation marks and citation omitted)), *with Montoya*, 2015-NMSC-010, ¶ 41 ("One can commit child abuse recklessly without acting intentionally, but one cannot intentionally commit child abuse without 'consciously disregarding a substantial and unjustifiable risk,' the definition of recklessness." (alteration, internal quotation marks, and citation omitted)).

respect to a material element of an offense when[,] if the element involves the nature of his conduct or a result thereof, it is his conscious object to engage in conduct of that nature or to cause such a result[.]"); *see also Stewart*, 2005-NMCA-126, ¶ 33. We therefore held that "where . . . [a d]efendant concedes that he acted purposely, i.e. [that] it [was] his 'conscious object to' injure an animal, this is sufficient evidence to establish that he had a 'willful disregard' for that animal's safety." *Stewart*, 2005-NMCA-126, ¶ 31 (emphasis added).

**{72}** *Stewart* has no bearing on the issue in this case: whether the given general intent instruction rendered the error in refusing Defendant's requested criminal negligence instruction harmless. The Court in *Stewart* held only that evidence sufficient to prove the *statutory* element "intentionally" of extreme cruelty to animals is necessarily *sufficient* to prove the statutory element "negligently" of basic animal cruelty. *Id.* ¶ 32. The case therefore provides no support for the proposition that a defendant necessarily acts with criminal negligence whenever the defendant "purposely does an act," UJI 14-141, constituting mistreatment. And because *Stewart* involved a challenge to the sufficiency of the evidence, rather than a reversible error analysis of an erroneous jury instruction, the Court's analysis there should not inform ours here. Here, we are not asked to determine whether the evidence was sufficient to prove that Defendant willfully disregarded the dogs' safety and endangered them—whether the jury could have found on the basis of the evidence and inferences favorable to the State that Defendant acted with criminal negligence in mistreating or injuring the dogs. *See generally State v. Tollardo*, 2012-NMSC-008, ¶ 39, 275 P.3d 110 ("[On sufficiency review], the appellate court must determine whether, after reviewing the evidence in the light most favorable to the prosecution"—"indulg[ing] all reasonable inferences and resolv[ing] all conflicts in the evidence in favor of the verdict"—"any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (internal quotation marks, emphasis, and citations omitted)). Instead, the issue before us is whether there is a "distinct possibility" that the jury convicted Defendant on the basis of an erroneous understanding of the law—whether, in light of the given instructions and evidence, the jury could have convicted Defendant upon a finding of only civil negligence. As I have explained, I think the answer is yes.

**{73}** I acknowledge that certain language in *Stewart* can be understood to support the majority's reading of the case. *See* 2005-NMCA-126, ¶ 31 ("The evidence was sufficient here to show that [the d]efendant acted with willful disregard for the puppy's safety because, as [the d]efendant concedes, he *acted intentionally in kicking the puppy*." (emphasis added)); *id.* ¶ 32 ("The question then is whether evidence that a defendant *acted* intentionally, purposely, or deliberately, in harming an animal, is sufficient to establish that the defendant acted with 'willful disregard' for the animal's safety. For purposes of the animal cruelty statute, we hold that it is." (emphasis added)). In my view, however, the language is dicta to that extent. As discussed above, the issue before us in *Stewart* was whether a conviction for cruelty to animals by negligent mistreatment could be upheld on the basis of evidence that would support a finding of the statutory element "intentionally" in the extreme cruelty to animals context. Our entire analysis consequently turned on the meaning of that element. And, as our opinion made

clear by its reliance on the Model Penal Code, we interpreted the "intentional[ity]" element to refer to a defendant's "conscious objective" to engage in a particular type of conduct or cause a particular result, rather than to the language of the general intent instruction.

**{74}** Although the majority and I read *Stewart* differently, we at least appear to agree on the meaning of UJI 14-141. The State, however, reads the instruction differently. In its view, the instruction sets forth a "more stringent" standard by requiring the jury to find a mens rea higher than—and therefore encompassing—criminal negligence. The State's reading of the instruction's language also finds support in our law. *See, e.g.*, *State v. Lucero*, 2017-NMSC-008, ¶¶ 28-32, 389 P.3d 1039 (agreeing "that a conviction of intentional child endangerment would be suspect if it were based on proof of some intentional act that accidentally (or even recklessly) placed [a child] in a dangerous situation[,]" but holding that an elements instruction requiring the jury to find that the defendant had "acted intentionally," separately defined as "purposely do[ing] an act," was not "incomplete" and did not "permit[] such a result"); *Ramos*, 2013-NMSC-031, ¶ 38 (Maes, C.J., dissenting) ("Although [UJI 14-141] requires a showing that the defendant made a bodily movement that constituted the act of the crime, . . . [its] second prong . . . requires more. A jury must also infer from the surrounding circumstances whether the defendant acted intentionally, meaning that he acted with intent to violate [a] restraining order."); *Duttle*, 2017-NMCA-001, ¶ 18 (interpreting the general intent instruction, when given in conjunction with an instruction on the elements of negligent cruelty to animals, to require evidence that the defendant had "intentionally mistreated, injured, or tormented or abandoned or failed to provide necessary sustenance to" the animals (internal quotation marks and citation omitted)); *Elliott*, 2001-NMCA-108, ¶ 9 (reasoning that, because the district court had given the general intent instruction, "[the d]efendant could not be convicted for an act of mere carelessness where he had no intent to fail to appear"); *State v. Garcia*, No. 33,756, dec. ¶ 30 (N.M. Sup. Ct. June 26, 2014) (non-precedential) (indicating in dicta that an erroneously given general intent instruction on a charge of negligent child abuse had not resulted in prejudice to the defendant because the instruction had "increased the burden on the [s]tate to prove that [the d]efendant purposefully committed the act of which he was convicted"). If the State is correct in its interpretation of UJI 14-141, and if one accepts the dubious assumption that the jury understood the instruction to apply to the charges of negligent cruelty, then the jury's finding that Defendant "act[ed] intentionally" necessarily includes a finding that Defendant acted with at least criminal negligence.

**{75}** While I disagree with the State's interpretation, the judges of this Court are in no position to definitively interpret UJI 14-141, an instruction that our Supreme Court has repeatedly considered. *See, e.g.*, *Ramos*, 2013-NMSC-031, ¶ 28. That does not mean, however, that the issue is settled or unworthy of consideration. The instruction is ubiquitous in New Mexico's criminal trials, but it has remained subject to conflicting interpretations.[14] And it strikes me as problematic to interpret the same instruction as

---

[14] This lack of clarity does not appear to have been a recent development. *See, e.g.*, *State v. Sheets*, 1980-NMCA-041, ¶¶ 45, 48, 94 N.M. 356, 610 P.2d 760 (stating that the language "purposely does an act" "covers" the concept

though it accurately describes both the voluntariness inherent in every crime and a significantly more culpable intentionality element. *Cf. Suazo*, 2017-NMSC-011, ¶ 24 ("It would be incongruent to interpret our second-degree murder statute to require a less culpable mental state (ordinary negligence) than the minimum level of culpability required by involuntary manslaughter (criminal negligence)."). If our appellate courts cannot settle on a consistent interpretation, I do not see how we can expect juries to do so.

**{76}** Fortunately, in this case it is unnecessary to determine whether the interpretation that the State offers on appeal is correct because that interpretation does not match the theory the State presented at trial. The State's trial theory was that Defendant had negligently mistreated or injured the dogs, not that she had intended to injure or mistreat them. I am not aware of any basis for concluding that the jury on its own initiative wandered beyond the State's trial theory to find that Defendant intended to mistreat or injure the dogs. Thus, even if the evidence was consistent with a theory of intentional mistreatment or injury, the State's reading of the instruction on appeal would provide this Court with no basis to affirm. *Cf. Lucero*, 2017-NMSC-008, ¶¶ 33-39 (indicating in dicta that any error in the correctly-given intent instruction was harmless because the state had "never flinched from its early decision to prove to the jury that [the d]efendant had intentionally, violently abused [the victim], resulting in her death"); *Magby*, 1998-NMSC-042, ¶ 21 (noting that the state had conceded error in the district court's giving of the general intent instruction where the state's sole theory throughout trial had been that the defendant's conduct was negligent).

## CONCLUSION

**{77}** The erroneous instruction deprived Defendant of her right to have the jury determine whether she acted with criminal negligence. Defendant's intent was a disputed issue at trial, and we consequently cannot determine whether the jury would have found criminal negligence had it been properly instructed. The general intent instruction given in this case did not render the error harmless because, even if the jury had understood it to apply to the elements of negligent mistreatment, the instruction required it to find only that Defendant had acted voluntarily, without any consideration of Defendant's subjective mental state. And, even if the instruction did require the jury to find that Defendant acted with a mental state more culpable than criminal negligence, there is no reason to believe that the jury understood that requirement because the State at trial pursued conviction only under a negligent mistreatment theory. I therefore cannot join my esteemed colleagues in upholding Defendant's convictions for cruelty to animals, and I must dissent.

**ZACHARY A. IVES, Judge**

---

of willfulness—intentional action "in the sense that [the defendant] was aware of what he was doing"—and that the instruction conveys the concept of "conscious wrongdoing" when what the defendant was doing turns out to be "an act [that] the law declares to be a crime" (internal quotation marks and citation omitted)).